# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**WILLARD DAVID HUTCHINSON**,

       **Petitioner,**

**v.**                                                        **Case No.: 3:14-cv-14975**

**DAVID BALLARD, Warden,**
**Mount Olive Correctional Complex**

       **Respondent.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

Pending before the Court are Petitioner Willard David Hutchinson's ("Hutchinson") *pro se* Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, (ECF No. 2), and Respondent's Corrected Motion for Summary Judgment, (ECF No. 21).[1] This case is assigned to the Honorable Robert C. Chambers, United States District Judge, and by standing order is referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). As a preliminary matter, the undersigned notes that the record before the Court is well-developed and provides a sufficient basis upon which to resolve this case without need for an evidentiary hearing. *See* Rule 8, Rules Governing Section 2254 Cases.

---

[1] Respondent's initial Motion for Summary Judgment named James Timothy Samples as the petitioner in its opening paragraph. (ECF No. 10 at 1). Respondent then moved to file a Corrected Motion for Summary Judgment, (ECF No. 20), and the undersigned granted that request, (ECF No. 23). Consequently, the undersigned **RECOMMENDS** that Respondent's Motion for Summary Judgment, (ECF No. 10), be **DENIED** as moot.

After thorough consideration of the record, the undersigned conclusively **FINDS** that (1) there are no material factual issues in dispute and (2) Petitioner is not entitled to the relief requested. Therefore, for the reasons that follow, the undersigned respectfully **RECOMMENDS** that the District Court **GRANT** Respondent's Corrected Motion for Summary Judgment; **DENY** Petitioner's Petition for a Writ of Habeas Corpus; and **DISMISS** this case from the docket of the court.

I.   <u>**Relevant Facts and Procedural History**</u>

   **A. Pretrial Proceedings, Trial, and Direct Appeal**

On May 14, 2001, Hutchinson was indicted by a Cabell County grand jury for the murder of Linda Rigney and the malicious wounding of Ms. Rigney's daughter, Jessica Ford. (ECF No. 10-1 at 2). Hutchinson was alleged to have stabbed both with a knife on February 9, 2001. (*Id.*) Prior to trial, the state trial court ordered that Hutchinson undergo a psychiatric evaluation to determine whether he was unable, "by virtue of mental incapacity or addiction to drugs or alcohol," to assist his attorneys' preparation of a defense and whether, on the date of the alleged crimes, he was "suffering from mental disease or defect or alcohol addiction to the extent that he lacked substantial capacity either to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements of the law." (ECF No. 10-1 at 19-20). Dr. Deleno H. Webb, III, a physician with a specialty in psychiatry and a board certification in forensic psychiatry, performed the evaluation. (ECF No. 10-2 at 71). Dr. Webb had some familiarity with Hutchinson because he had previously performed a competency evaluation of Hutchinson in 1999. (*Id.* at 72).

Dr. Webb testified at Hutchinson's competency hearing that, after reviewing records provided by Hutchinson's counsel and the trial court and after performing an

interview and psychological testing with Hutchinson, he concluded Hutchinson exhibited symptoms of paranoid schizophrenia. (*Id.*) Dr. Webb reported that Hutchinson suffered from persecutory and grandiose delusions and that Hutchinson was preoccupied with developing "some sort of important theories regarding the speed of light." (*Id.*) Dr. Webb also observed that Hutchinson used words that only had meaning to him, which is known as neologism. (*Id.*) Nevertheless, Dr. Webb opined that in spite of his mental illness, Hutchinson was "quite capable" of aiding his attorneys and that he possessed a "reasonable degree of rational understanding of the proceedings against him." (*Id.*) Dr. Webb also testified that, although "there was no way to assess with 100 percent certainty what [Hutchinson's] mental condition was at the time of the crime," Hutchinson could appreciate the criminality of his conduct at that time. (*Id.*) In support of his opinion, Dr. Webb stated that he saw no evidence that would lead him to believe that Hutchinson was delusional at the time of the crimes. (*Id.* at 72-73). Dr. Webb relayed that Hutchinson did not report during the evaluation that he was suffering from any delusion at the time of the crimes. (*Id.* at 73). In addition, Dr. Webb stated that Hutchinson recalled many specific facts about the night of the crimes in a prior report. (*Id.* at 76-77). On the subject of intoxication, Dr. Webb noted that Hutchinson had a blood alcohol content of 0.15 when he was tested four hours after the crimes. (*Id.* at 76). Dr. Webb concluded that this could mean Hutchinson was "pretty intoxicated" at the time of the crimes; however, Dr. Webb pointed out that Hutchinson possessed "an extremely high tolerance" for alcohol given his history of alcohol abuse and that Hutchinson became intoxicated "of his own volition" on the day of the crimes. (*Id.* at 72-73, 75-76).

Hutchinson's mother, Barbara Hutchinson, also testified at the competency hearing. Ms. Hutchinson described her son as paranoid and as an alcoholic. (*Id.* at 77). She stated that Hutchinson talks to himself, believes he's developing important scientific theories, and uses words that only have meaning to him. (*Id.* at 78). Ms. Hutchinson also stated that her son did not believe Ms. Rigney was dead. (*Id.*) Finally, Hutchinson's counsel, John Laishley, proffered to the trial court that Hutchinson had not been assisting in his own defense and that the information Mr. Laishley knew about the case came directly from the prosecution, the police, and the discovery obtained by defense counsel. (*Id.*) At the conclusion of the hearing, the trial court found that Hutchinson was competent to assist counsel and stand trial, and that Hutchinson was competent at the time of the alleged crimes. (*Id.*) The court entered a written order finding the same on September 19, 2001. (ECF No. 10-1 at 23-24).

Prior to trial, the state trial court also held a hearing on the admissibility of "other acts" evidence, typically referred to as 404(b) evidence. During that hearing, the prosecution moved for the admission at trial of testimony regarding two other violent encounters between Hutchinson and the victims. Jessica Ford testified that in December 2000, she observed Hutchinson punching Ms. Rigney in the face in the kitchen of the home that they shared. (ECF No. 10-2 at 99-100). Jessica stated that Ms. Rigney suffered a "busted" lip, black eye, and broken nose as a result of Hutchinson's assault. (*Id.* at 100). During the same incident, Jessica witnessed Hutchinson grab Ms. Rigney by the hair while holding a knife in his hand. (*Id.* at 99). Approximately fifteen minutes after the assault, Ms. Rigney, who was visibly upset and crying, told Jessica that Hutchinson had threatened her with the knife. (*Id.* at 101-04). Jessica also testified about a second incident that occurred in January 2001, again at the Rigney/Hutchinson

4

residence. (*Id.* at 104). According to Jessica, Ms. Rigney and Hutchinson were arguing in Jessica's presence over a child support check, and Hutchinson pushed Jessica. (*Id.* at 106-07). Hutchinson later pled guilty to a domestic battery charge arising out of that incident. (*Id.* at 116-17). At the conclusion of the evidentiary hearing, the trial court found that evidence of both incidents would be admissible at trial to establish Hutchinson's motive and intent on the night of the crimes as well as to "give the jury a complete picture of what life was like in th[e] household." (*Id.* at 121). In a subsequent written order, the trial court found that the probative value of the evidence outweighed any prejudicial effect and reiterated that the evidence could only be introduced at trial for "the limited purpose of completing the story in this case and on the issues of motive and intent." (ECF No. 10-1 at 29).

Hutchinson's trial began on September 4, 2001. (ECF No. 10-3 at 2). During jury selection, a number of jurors stated that they knew witnesses that the prosecution might call. As relevant to Hutchinson's claims, jurors Frances Heck and Diana Millne both stated during voir dire that they knew former Huntington Police Department ("HPD") Detective Tim Murphy. (*Id.* at 31, 33). Both jurors asserted that they could evaluate former Detective Murphy's testimony in a fair and impartial manner. (*Id.*) Ms. Millne also stated that she knew HPD Officer Steve Zickefoose, but again affirmed that she could weigh the officer's testimony fairly and impartially. (*Id.* at 31). Shortly after the jury was seated and trial began, Ms. Heck realized that she knew two more potential prosecution witnesses: Kathy Samples and Anthony Jenkins.[2] (*Id.* at 126). During additional voir dire outside of the presence of the other jurors, Ms. Heck stated that she

---

[2] Hutchinson mistakenly asserts that Ms. Heck also knew Officer Zickefoose. (ECF No. 3 at 34). Nothing in the record supports that assertion. Additionally, Hutchinson does not raise any claim regarding Ms. Heck's relationship to Ms. Samples and Mr. Jenkins in his brief.

could evaluate both witnesses' testimony as if she did not know them and that she would not be likely to believe their testimony based on her relationships with them. (*Id.* at 127-30). Defense counsel did not object to Ms. Heck remaining on the jury. (*Id.* at 131).

The prosecution's first witness was HPD Officer Stephen Compton. Officer Compton testified that he first interacted with Hutchinson at 4:19 p.m. on February 9, 2001, when he was dispatched on a "check welfare call" for "two juvenile females" to the home where Ms. Rigney, her children, and Hutchinson lived. (ECF No. 10-3 at 83). Officer Compton recalled that Hutchinson answered the door and answered various questions that he was asked. (*Id.* at 85-86). Officer Compton observed that Hutchinson appeared to be "under the influence." (*Id.* at 114). Hutchinson then consented to Officer Compton searching the home. (*Id.* at 86). After not finding anyone else in the home, Officer Compton departed. (*Id.* at 86-87).

Later that day, at 5:54 p.m., Officer Compton was dispatched to the home for a domestic disturbance. (*Id.* at 87). While en route to the home, Officer Compton was informed that a stabbing had occurred there. (*Id.* at 88). Upon arriving at the home, Officer Compton noticed a number of people in the street and heard one of those people say that a possible suspect ran behind the house. (*Id.* at 88-89). After searching behind the house, which proved unfruitful, Officer Compton was told by another person in the crowd that "she's upstairs." (*Id.* at 89-90). Officer Compton then entered the home, walked up the stairs, looked into a bedroom, and saw Chris Ford, Ms. Rigney's son, holding Ms. Rigney. (*Id.* at 90, 92-93). Officer Compton observed that Ms. Rigney was unconscious and bleeding from the mouth. (*Id.* at 94). He also noticed a bloody knife in the doorway of the bedroom. (*Id.* at 94, 96). Officer Compton then asked Mr. Ford to identify himself, which Mr. Ford did, and Officer Compton inquired of Mr. Ford "who

did it." (*Id.* at 97-98). Mr. Ford replied, "It was Hutch." (*Id.* at 98). At approximately 6:39 p.m., while standing on the home's front porch to preserve the scene, Officer Compton heard screaming in the street and someone say "it's him" or "he's back." (*Id.* at 103-04). Looking down the street, Officer Compton saw Hutchinson being led back toward the residence by another unidentified individual. (*Id.* at 104). As Hutchinson approached the residence, Officer Compton gave him verbal commands with which he complied. (*Id.* at 106). Officer Compton noticed that Hutchinson appeared less intoxicated than when the two interacted earlier that day. (*Id.* at 107). Officer Compton also observed that Hutchinson had blood on his face and hands as well as a swollen right eye. (*Id.* at 111). Hutchinson was then arrested and taken to police headquarters where an Intoxilyzer test was administered at 10:34 p.m. (*Id.* at 109). At that point, Hutchinson's blood alcohol content was 0.15. (*Id.*)

The prosecution's next witness was Jessica Ford. After the trial court instructed the jury on the proper use of the 404(b) evidence to be presented through Jessica's testimony, Jessica testified about the two prior incidents of violence in the home that were the subject of the 404(b) hearing. (*Id.* at 137-39, 144-51). Jessica next testified about the events of February 9, 2001. In describing the night of Ms. Rigney's death, Jessica recalled that she, Mr. Ford, Ms. Rigney, Hutchinson, and Shannon Rigney, another of Ms. Rigney's daughters, were all present in the home. (*Id.* at 154-55). Ms. Rigney, Jessica, and Hutchinson were all in Ms. Rigney's bedroom when Ms. Rigney asked Jessica to find a duffle bag so that Ms. Rigney could pack up Hutchinson's clothes because "she was getting tired of him drinking alcohol all the time and taking drugs." (*Id.*) After searching the attic and entering Mr. Ford's room to ask for a duffle bag, Jessica heard her mother scream. (*Id.* at 158). Jessica ran back into her mother's room

7

and saw Hutchinson holding her mother up against the wall with his left hand. He had a crystal handled dagger[3] in his right hand. (*Id.* at 158-59). Jessica saw blood pouring out of her mother's mouth and observed that her mother's shirt was covered in blood. (*Id.* at 159). Jessica pulled Hutchinson away from her mother, and Hutchinson stabbed Jessica in the arm. (*Id.* at 161). Mr. Ford then entered the room and began hitting Hutchinson. (*Id.*) Hutchinson started punching Mr. Ford in return, and threw him to the ground. (*Id.* at 163). After observing Hutchinson strike Mr. Ford, Jessica ran downstairs, out of the home, and to a neighbor's house. (*Id.* at 163-64). She later received stitches for her wound. (*Id.* at 164).

On cross-examination, defense counsel pointed out that during an interview with HPD Detective Chris Sperry on February 20, 2001, Jessica stated that she did not see a knife in Hutchinson's hand on February 9. (*Id.* at 166). Defense counsel also pointed out that during that same interview, in discussing the December 2000 incident, Jessica stated Hutchinson did not have a knife. (*Id.* at 167). Jessica also testified on cross-examination that Hutchinson "acted like he was in his own little world sometimes." (*Id.* at 171). On redirect examination, Jessica stated that she was absolutely sure that she saw a knife in Hutchinson's hand on February 9, 2001, and that she observed Hutchinson with a knife during the December 2000 incident, but that Hutchinson was not holding a knife when he was punching Ms. Rigney. (*Id.* at 174, 177). At some point during Jessica's testimony, Hutchinson alleges that another of Ms. Rigney's daughters, Angela Ford, began screaming and crying in front of the jury before being escorted out of the courtroom. (ECF No. 3 at 35). Yet, the trial transcript does not reflect that this occurred.

---

[3] Some witnesses described the suspected murder weapon as a knife and some described it as a dagger, but all were referring to the same piece of physical evidence introduced at trial by the prosecution. This PF&R uses the terms interchangeably based on the witness's testimony.

The prosecution next called Mr. Ford. He testified that he and Hutchinson were at their home during the day on February 9 and that Hutchinson was intoxicated after drinking alcohol. (ECF No. 10-3 at 187-88). Mr. Ford left the home and went to a neighbor's house. (*Id.* at 189). Mr. Ford returned to the home later that day and observed Ms. Rigney in her bedroom packing Hutchinson's clothes into a garbage bag. (*Id.* at 191). Mr. Ford then began cleaning his bedroom. (*Id.* at 189-90). While cleaning his room, Mr. Ford heard Ms. Rigney and Hutchinson arguing. (*Id.* at 191-92). He then heard "a thump on the floor" and screaming. (*Id.* at 192). He entered Ms. Rigney's bedroom and saw Hutchinson and Jessica on the floor. (*Id.* at 193). He also saw Hutchinson holding a dagger and Ms. Rigney bleeding from her chest. (*Id.* at 193, 198). Mr. Ford then pulled Hutchinson off of Jessica and put him in a headlock. (*Id.* at 194). Mr. Ford recalled that Hutchinson dropped the dagger on the floor when Mr. Ford grabbed him. (*Id.* at 196). Mr. Ford and Hutchinson exchanged blows, and Hutchinson "took off downstairs." (*Id.* at 194, 197). Mr. Ford then went downstairs to try to find help. (*Id.* at 199). When he could not, he returned to Ms. Rigney and attempted to stop her bleeding and resuscitate her. (*Id.*) On cross-examination, Mr. Ford described Hutchinson as "strange" and "crazy" based on the things that Hutchinson would say to him. (*Id.* at 200). On redirect examination, Mr. Ford stated that on February 9, Hutchinson did not say anything unusual. (*Id.* at 202). Mr. Ford further testified that Hutchinson had only "talk[ed] crazy" about ten years prior to the trial. (*Id.* at 201).

The prosecution's next witness was HPD Detective Chris Sperry. Detective Sperry stated that he collected the clothing that Hutchinson was wearing the night of the crimes. (*Id.* at 205-06). He testified that the inside of Hutchinson's jacket had blood on it. (*Id.* at 206-07). Detective Sperry also testified that blood was found inside the home

on the stairs and on a banister. (*Id.* at 214). On cross-examination, Detective Sperry stated that he found specks of blood on a television in Mr. Ford's bedroom, but that he did not request that the blood be tested for DNA evidence. (*Id.* at 218, 222).

The prosecution then called David Castle, a supervisor with the HPD's Criminal Identification Unit, which is responsible for collecting, preserving, and processing evidence from the scenes of major crimes. (*Id.* at 226-27). Corporal Castle testified that he found bloodstains on some of the stairs in the home and a bloody knife near the doorway of Ms. Rigney's bedroom. (*Id.* at 232). In Ms. Rigney's bedroom, Corporal Castle found a large pool of blood and various objects with blood spatter on them, including bloodstains on a dresser that indicated that the blood came from "above the height of the dresser . . . in a downward trajectory." (*Id.* at 233). Corporal Castle also testified that he observed Ms. Rigney's clothing after her death and that there appeared to be three separate holes caused by a knife. (ECF No. 10-4 at 9). As for the knife used to stab Ms. Rigney and Jessica, Corporal Castle testified that he collected the knife, but that there were no "usable" fingerprints on it. (*Id.* at 9, 38). Corporal Castle also explained that he collected a number of blood swabs throughout the house for DNA testing, but not all of the samples were tested for DNA by West Virginia State Police personnel because West Virginia State Police personnel "like to keep the number of samples per case down so that they can move on to other cases." (*Id.* at 18-19). Thus, Corporal Castle had only the "most critical samples" tested for DNA by the West Virginia Biochemistry Laboratory. (*Id.* at 19).

The prosecution next called Carey Cathcart, an identification technician with the HPD. (*Id.* at 48-49). Ms. Cathcart testified that she took photographs of the exterior and interior of the home as well as photographs of Hutchinson after his arrest. (*Id.* at 51, 53).

Ms. Cathcart also collected blood swabs from Hutchinson's face, chest, and hands. (*Id.* at 53).

Former HPD Detective Tim Murphy then testified. (*Id.* at 80). Shortly after Hutchinson was arrested, Detective Murphy advised Hutchinson of his Miranda rights and began to interview him at the HPD headquarters. (*Id.* at 81). Detective Murphy observed that Hutchinson was "probably slightly intoxicated," but that he "knew what was going on." (*Id.* at 83). During the interview, Hutchinson told Detective Murphy that he and Ms. Rigney had been arguing and that Ms. Rigney had been packing his things up for him to leave because she was upset by his drinking. (*Id.* at 84). Hutchinson then stated that he left once Ms. Rigney instructed him to do so and that he "ran through a couple briar patches" before being confronted by a black male who led him back to the home at gunpoint. (*Id.* at 85). Hutchinson recalled that he was arrested by a police officer with a Glock pistol upon his return to the home. (*Id.*) Detective Murphy testified that later in the interview, Hutchinson claimed that he left immediately after Ms. Rigney told him to and that there was no argument. (*Id.* at 86). Hutchinson also informed Detective Murphy that the injuries to his face were caused by Mr. Ford. (*Id.* at 88). Hutchinson never admitted stabbing Ms. Rigney. (*Id.* at 94). Throughout the interview, Hutchinson appeared to understand all of Detective Murphy's questions, and Detective Murphy described Hutchinson as "in control and lucid." (*Id.* at 87). After having an Intoxilyzer test administered to Hutchinson, Detective Murphy informed Hutchinson that Ms. Rigney was dead and again advised him of his Miranda rights. (*Id.* at 90-91). At that point, Hutchinson ended the interview. (*Id.* at 91).

The prosecution then called Dr. Zia Sabet, Deputy Chief Medical Examiner for the State of West Virginia. (*Id.* at 95). Dr. Sabet testified that he performed Ms. Rigney's

autopsy on February 10. (*Id.* at 98-99). Dr. Sabet reported finding three stab wounds on Ms. Rigney's chest, two of which would have been fatal. (*Id.* at 100-02). Dr. Sabet described the wounds as "front to back and straight." (*Id.* at 112). Dr. Sabet also observed a nonfatal wound on Ms. Rigney's right arm, which he described as a defensive wound. (*Id.* at 106-07). After examining the dagger collected by HPD personnel, Dr. Sabet opined that the weapon was consistent with Ms. Rigney's injuries, but that he was not "100 percent certain" that the knife was used in Ms. Rigney's stabbing. (*Id.* at 109). At some point during Dr. Sabet's testimony, Hutchinson asserts that there was another outburst from Angela, who allegedly began screaming and crying in the hallway next to the courtroom. (ECF No. 3 at 35). The trial transcript reflects that defense co-counsel, Ryan Turner, inquired at the conclusion of Dr. Sabet's testimony whether he needed to object to some unspecified conduct, but Mr. Laishley stated that the trial court "effectively took care of th[e] situation immediately upon its happening." (ECF No. 10-4 at 115). Again, the record does not reflect that any interruption occurred.

The prosecution's final witness was David Miller, a forensic DNA analyst with the West Virginia Biochemistry Laboratory. (*Id.* at 155). Mr. Miller testified that he performed DNA testing on various blood swabs collected by the HPD by comparing the blood swabs with samples from Hutchinson, Jessica, Mr. Ford, and Ms. Rigney. (*Id.* at 164-65). Mr. Miller found that Hutchinson's blood was on the stair railing in the home and on both of his hands.[4] (*Id.* at 174, 177, 178-79, 181). Mr. Miller also testified that Ms. Rigney's blood was found in Ms. Rigney's room, on the knife suspected to be the murder weapon, and on Hutchinson's chest, cheeks, and left thumbnail. (*Id.* at 175-78).

---

[4] Mr. Miller stated that he could not definitively state that Hutchinson's blood was found on the stair railing, but that the odds of the DNA belonging to another person were one in 3,270,000,000. (ECF No. 10-4 at 174-75).

The defense's first witness was Dr. Webb. Dr. Webb opined that Hutchinson suffered from paranoid schizophrenia, alcohol abuse, and antisocial personality disorder. (*Id.* at 196). Dr. Webb explained that persons who suffer from paranoid schizophrenia often exhibit delusional thinking. (*Id.*) Dr. Webb testified that Hutchinson suffered from paranoia and delusions. (*Id.* at 196-97). As an example, Dr. Webb stated that Hutchinson reported that he was working on a time travel machine in his attic and that Hutchinson believed he could transcend time and space. (*Id.*) Dr. Webb also observed that Hutchinson was paranoid that people did not like him or were talking about him. (*Id.* at 202). Dr. Webb noted that Hutchinson should be on medication for his mental illness. (*Id.* at 203).

On cross-examination, Dr. Webb opined that Hutchinson was competent to stand trial and competent at the time of the crimes based on Dr. Webb's review of police reports, psychological testing, and Hutchinson's statements during a one-half-hour to forty-five minute interview. (*Id.* at 206-07, 221). Dr. Webb also testified that Hutchinson was given the Minnesota Multiphasic Personality Inventory-2 test and that his F-scale score was very high, meaning that Hutchinson was either making misrepresentations during the test or emphasizing his psychotic symptoms due to his illness. (*Id.* at 209). He opined that there was no general correlation between paranoid schizophrenia and criminal competency. (*Id.* at 214-15). Dr. Webb also offered an opinion as to Hutchinson's ability to function during the crimes based on his intoxication. He stated that, based on alcohol dissipation rates, it was "safe to say" that Hutchinson's blood alcohol content at the time of the crimes would have been around 0.21. (*Id.* at 213). Dr. Webb further opined that persons who suffer from alcoholism can function at much higher levels of intoxication. (*Id.* at 212-13).

13

On redirect examination, defense counsel pointed out that Dr. Webb did not know how often Hutchinson drank alcohol, which would affect his opinion as to Hutchinson's ability to function on the night of the crimes. (*Id.* at 221). On the subject of behavioral control by mentally ill persons, Dr. Webb asserted that persons who suffer from severe mental illness can control themselves "greater than 50 percent" of the time. (*Id.* at 217). Dr. Webb also testified that irrational beliefs alone do not necessarily interfere with a person's ability to carry on daily activities or to tell right from wrong. (*Id.* at 219). Finally, on re-cross-examination, Dr. Webb stated that Hutchinson did not report any delusions related to Ms. Rigney, and thus, Hutchinson could appreciate the criminality of his conduct. (*Id.* at 223-24).

The defense next called Ms. Hutchinson. She testified that she believed her son was "crazy" and that he believed he was working on a time machine. (*Id.* at 228). Ms. Hutchinson further testified that her son would talk to himself and that he thought people were out to get him. (*Id.* at 229-30). Defense counsel also attempted to elicit testimony from Ms. Hutchinson related to a conversation between her and Ms. Rigney. During that conversation, Ms. Rigney informed Ms. Hutchinson that she had started a fight in the living room with Hutchinson by striking him. (*Id.* at 251). Defense counsel hoped to use this testimony to rebut Jessica's description of the December 2000 incident. (*Id.*) However, the trial court sustained the prosecution's hearsay objection to the testimony. (*Id.* at 234).

The defense's next witness was Matt Taylor, who described Hutchinson as one of his best friends. (*Id.* at 239). Mr. Taylor stated that Hutchinson believed he was a scientist and that Hutchinson once "dove out" of the window of Mr. Taylor's car while it was moving after saying that "they were going to get him." (*Id.* at 245). Mr. Taylor also

14

testified that he visited Hutchinson at his home around 1:30 p.m. on February 9 and that Hutchinson appeared drunk. (*Id.* at 240).

The defense's final witness was Hutchinson. He testified that he had been developing a theory on "warp drive" since 1996 and that he had been in contact with other cultures in outer space that had the technology to implement his theory. (ECF No. 10-5 at 28-30). Hutchinson also claimed that he had been to space in a "star ship" and that he had been involved in a space war. (*Id.* at 32-33). Hutchinson recalled that during the December 2000 incident, Ms. Rigney slapped him before he punched her. (*Id.* at 35). Hutchinson also denied ever shoving Jessica during the January 2001 incident. (*Id.* at 63). Hutchinson could not recall many details of the afternoon of February 9, but he did remember drinking a pint of whiskey, taking Zyprexa, and playing video games with Mr. Taylor. (*Id.* at 45-48, 59). The next thing he remembered was waking up in his and Ms. Rigney's bed. (*Id.* at 48-49). Ms. Rigney had a knife in her left hand and told Hutchinson to leave. (*Id.* at 49). Mr. Ford then entered the bedroom and shoved Hutchinson. (*Id.*) After being shoved, Hutchinson went up into the attic, which was accessible through stairs in his and Ms. Rigney's bedroom. (*Id.*) Hutchinson then heard a scream and went back down the stairs into the bedroom where he found Ms. Rigney lying face down on the floor surrounded by blood. (*Id.* at 50). Hutchinson testified that he turned Ms. Rigney over to listen for a heartbeat, and he was then kicked in the back and punched by Mr. Ford. (*Id.*) Hutchinson then ran outside. (*Id.* at 51). According to Hutchinson, a short while later, a man stuck a pistol in his side and grabbed him by the arm to lead him back to the home. (*Id.* at 52). Hutchinson also remembered being arrested and interviewed by the police. (*Id.*) He stated that he did not believe that Ms. Rigney was dead because he had spoken with her the Sunday after she was stabbed and

she told him that she was going to her home in space. (*Id.* at 53-54). On cross-examination, Hutchinson admitted that he knew it was wrong to commit a violent act against another person. (*Id.* at 59). Still, Hutchinson denied stabbing Ms. Rigney. (*Id.* at 73). Hutchinson also acknowledged that he did not have delusions related to Ms. Rigney and that he did not remember feeling as if anything were after him on February 9. (*Id.* at 61).

After deliberating for less than two hours, the jury found Hutchinson guilty of unlawful wounding, which is a lesser-included offense of malicious wounding, and first-degree murder. (*Id.* at 122-23). A *LaRock*[5] proceeding was then conducted in order for the jury to determine whether Hutchinson should be sentenced to life in prison with or without mercy. In his opening statement, defense counsel stated that both Hutchinson and Ms. Hutchinson did not wish to testify again. (*Id.* at 146). However, defense counsel did ask the jury to consider Dr. Webb's trial testimony and Hutchinson's mental illness in reaching their decision. (*Id.* at 146-47). The prosecution presented the testimony of Angela, Mr. Ford, and Jessica, who all described how their mother's death had severely and negatively impacted them. (*Id.* at 153-62). The prosecution also introduced evidence of Hutchinson's criminal record, including convictions for first-degree arson, battery, and possession of a short-barrel shotgun that was not registered to him. (*Id.* at 164-65, 167, 169). The jury found that mercy was not warranted. (*Id.* at 180). As such, Hutchinson was sentenced to life in prison without the possibility of parole on the first-degree murder conviction. (ECF No. 10-1 at 53). He was also sentenced to a term of one-to-five years' imprisonment on the unlawful wounding conviction, which was to run consecutive to the life sentence. (*Id.*)

---

[5] *State v. LaRock*, 470 S.E.2d 613 (W. Va. 1996).

On July 3, 2002, Hutchinson filed a petition for appeal with the Supreme Court of Appeals of West Virginia ("WVSCA"). (*Id.* at 63). In his petition, Hutchinson raised two issues: 1. the trial court erred in admitting certain 404(b) evidence, and 2. the trial court improperly excluded rebuttal evidence that the defense sought to introduce in response to the prosecution's allegations of prior bad acts. (*Id.* at 64). The WVSCA refused Hutchinson's petition for appeal on April 9, 2003. (*Id.* at 81).

### B. State Habeas Proceedings

In May 2003, Hutchinson filed a petition for a writ of habeas corpus and a motion for appointment of counsel in Cabell County Circuit Court. (*Id.* at 177). In June 2003, Steve Jarrell was appointed counsel to assist Hutchinson in state habeas proceedings. (*Id.* at 87). While state habeas proceedings were pending, the circuit court entered an order permitting habeas counsel to have certain blood swabs and a carpet cutting retested for DNA evidence by an independent laboratory. (*Id.* at 145-46). In order to accomplish this, the circuit court ordered Roy Johnson, the court reporter in possession of those items, to transfer the evidence to Corporal Castle so that he could send it to an independent laboratory for testing. (*Id.* at 142). Initially, the blood swabs could not be located. (*Id.* at 150). However, they were later found in the court reporter's evidence room and retested by Human Identification Technologies, Inc. (*Id.* at 153, 159-75).

On July 1, 2009, an omnibus state habeas corpus hearing was held. (ECF No. 10-5 at 193). At the outset of the hearing, Mr. Jarrell noted that he had received the DNA retesting results from Human Identification Technologies, Inc., and that there were some differences between the results originally obtained by the West Virginia Biochemistry Laboratory and the more recent test results. (*Id.* at 194). Although, both

17

Mr. Jarrell and the prosecution agreed that the differences were not substantial and were likely due to the state laboratory having more material to test with less degradation. (*Id.* at 194-96).

The first witness called at the state habeas hearing was Mr. Laishley. He testified that he did not recall requesting a grand jury transcript, but that he did not believe he would have needed it in preparing an insanity defense. (*Id.* at 199-200). Mr. Laishley also remembered receiving a lot of discovery material from the prosecution and showing the material to Hutchinson prior to trial. (*Id.* at 200-01). Mr. Laishley stated that he made requests to interview Ms. Rigney's children, but he was not permitted to do so. (*Id.* at 201-02). He also testified that he did not request a second competency evaluation of Hutchinson even though Dr. Webb found Hutchinson to be competent. (*Id.* at 204-05).

Mr. Jarrell also called Mr. Johnson as a witness. Mr. Johnson testified that he was the court reporter at the time of Hutchinson's trial and he was responsible for maintaining the evidence introduced at trial. (*Id.* at 209). Mr. Johnson stated that he initially was unable to find the blood evidence presented at trial, but he eventually found the evidence in the evidence room when cleaning out his office. (*Id.* at 209-10). Mr. Johnson testified that the blood evidence was in his custody from the time of the trial until the time that he found it in his office's evidence room because he was the only person with a key to the evidence room. (*Id.* at 212).

On October 22, 2009, the circuit court issued an order denying habeas relief. (ECF No. 10-1 at 177). The circuit court noted that Hutchinson had raised two general grounds for relief: 1. the reliability of the serology evidence, and 2. ineffective assistance of counsel. (*Id.* at 181). However, the circuit court found neither claim warranted relief.

(*Id.* at 181-88). The next day, Mr. Jarrell filed an amended petition for a writ of habeas corpus raising thirteen grounds for relief. (*Id.* at 191-256). Hutchinson subsequently filed an objection to the circuit court's October 22, 2009 order, on the ground that the circuit court had failed to address all of the claims raised in Hutchinson's habeas petition. (*Id.* at 259-62). On October 10, 2010, the circuit court issued an amended order addressing all of Hutchinson's claims and again denying habeas relief. (*Id.* at 265-92).

In November 2011, Hutchinson appealed the circuit court's decision to the WVSCA. (ECF No. 10-2 at 2). In his notice of appeal, Hutchinson raised eighteen assignments of error. (*Id.* at 7-9). He later filed an amended petition for appeal adding two more assignments of error. (*Id.* at 21). On April 16, 2013, the WVSCA issued a memorandum decision adopting and incorporating the circuit court's amended order denying habeas relief. (*Id.* at 53-54). The WVSCA concluded that "no substantial question of law and no prejudicial error" existed in Hutchinson's case, and therefore, he was not entitled to habeas relief. (*Id.* at 52).

### C. Federal Habeas Petition

On April 17, 2014, Hutchinson filed his section 2254 petition seeking a writ of habeas corpus. (ECF No. 2). On June 2, 2014, the undersigned ordered Respondent to answer the petition. (ECF No. 8). On August 1, 2014, Respondent filed an answer, (ECF No. 9), and a motion for summary judgment, (ECF No. 10). In his answer, Respondent asserted that Hutchinson's petition was timely and that the state court remedies for the claims raised in the petition have been exhausted.[6] (ECF No. 9 at 2). On November 21, 2014, Hutchinson filed a response brief to Respondent's motion for summary judgment,

---

[6] To the extent that any claims presented in Hutchinson's federal habeas petition are unexhausted because they were not raised on appeal to the WVSCA, the undersigned recommends their denial on the merits pursuant to 28 U.S.C. § 2254(b)(2).

(ECF No. 19), and less than one week later, on November 26, 2014, Respondent filed a reply brief, (ECF No. 22). Therefore, the issues have been fully briefed and are ready for resolution.

## II.   Hutchinson's Claims

Hutchinson asserts the following grounds in support of his section 2254 habeas petition:

1. The trial court violated Hutchinson's federal constitutional rights to equal protection, due process of law and a fair and impartial jury because the trial court violated Rules 402 and 703 of the West Virginia Rules of Evidence by improperly allowing testimony of other crimes, wrongs or acts in violation of Rule 404(b) that irreparably prejudiced the Petitioner's jury verdict in the instant case. (ECF No. 2 at 4).

2. The trial court violated Hutchinson's federal constitutional rights under the Fifth and Fourteenth Amendments of the United States Constitution to equal protection, due process of law, and a fair and impartial jury trial because the trial court erred in improperly excluding rebuttal evidence presented by the defendant to allegations of prior bad acts. (*Id.* at 5-6).

3. Hutchinson's federal constitutional rights under the Fifth and Fourteenth Amendments of the United States Constitution to equal protection, due process of law, and a fair and impartial jury trial were violated due to ineffective assistance of trial counsel.[7] (*Id.* at 7).

    a. Trial counsel was ineffective when he failed to move for a change of venue due to the nature of the case and the pretrial publicity that it received. (ECF

---

[7] Hutchinson's specific ineffective assistance of counsel claims are set forth in his memorandum filed in support of his petition, (ECF No. 3).

No. 3 at 31).

b. Trial counsel was ineffective when he failed to look into various aspects brought to his attention, or make a reasonable investigation for possible exculpatory or mitigating evidence. (*Id.*)

c. Trial counsel was ineffective when he failed to obtain an expert psychiatrist for the sentencing phase of Hutchinson's trial. (*Id.* at 32).

d. Trial counsel was ineffective when he failed to disqualify two prospective jurors when those two jurors had a social relationship with officers who were involved in Hutchinson's case. (*Id.* at 32-33).

e. Trial counsel was ineffective when he failed to obtain a copy of the grand jury transcripts in Hutchinson's case. (*Id.* at 34).

f. Trial counsel was ineffective when he failed to object to a violation of the Confrontation Clause where Jessica never looked at Hutchinson or mentioned his name during her testimony and hid behind the trial court bench. (*Id.*)

g. Trial counsel was ineffective when counsel failed to move the trial court to compel an interview with prosecution witnesses when their testimonies were different from their pretrial statements to the police. (*Id.*)

h. Trial counsel was ineffective when he failed to object to the inappropriate behavior of prosecution witnesses during the trial. (*Id.* at 35).

4. Hutchinson's constitutional rights to equal protection, due process of law, and a fair and impartial jury trial were violated because the trial court failed to give him access to competent evaluators to determine whether his state of mind made him not criminally responsible and not competent to stand trial or to testify which constitutes a deprivation of due process in violation of the Fifth, Sixth, and Fourteenth Amendments

of the United States Constitution. (ECF No. 2 at 8).

5. The trial court violated Hutchinson's constitutional rights under the Fourteenth Amendment of the United States Constitution when it did not order a change of venue *sua sponte* due to extensive, negative, and prejudicial pretrial publicity, and the jury pool in this case was not impartial, and consequently a request for a change in venue should have been made by trial counsel. (*Id.* at 9).

6. The trial court committed numerous reversible and prejudicial errors thereby violating his federal constitutional rights to equal protection, due process of law, and a fair and impartial jury trial due to the cumulative effects of errors committed by the trial court, prosecuting attorney, and trial counsel during his pretrial, trial, sentencing and other post-trial proceedings. (*Id.* at 10).

7. The trial court violated Hutchinson's federal constitutional rights to equal protection, due process of law, and a fair and impartial jury trial because the court denied defense counsel's motion for a directed verdict of acquittal for lack of sufficient evidence of the elements of first degree murder and unlawful wounding and were insufficient to exclude every reasonable hypothesis of innocence. (*Id.* at 11).

8. The trial court violated Hutchinson's federal constitutional rights to equal protection, due process of law, and a fair and impartial jury trial because the court failed to give the jury the proper instructions including, but not limited to, a *Brant* instruction during the jury charges. (*Id.* at 12).

9. The trial court violated Hutchinson's federal constitutional rights to equal protection, due process of law, and a fair and impartial jury trial because the prosecuting attorney committed prosecutorial misconduct. (*Id.* at 13).

10. The decision by the WVSCA to refuse review of the direct petition for appeal

violated Hutchinson's due process rights as guaranteed by the United States Constitution, the Eighth Amendment, and the Fourteenth Amendment. (*Id.* at 14-15).

11. Violations related to the serology evidence tested and admitted at trial. (*Id.* at 16).

12. Hutchinson "moves to dismiss the two count indictment herein that it alleges, under Count One, a violation of West Virginia Code § 61-8D-2(a), which statute, in its application via West Virginia Code § 61-2-2, is in violation of the Constitution of the United States as it permits an impermissible and unconstitutional shifting of the burden of proof to the defendant in order to receive mercy from the jury." (*Id.* at 17).

## III.   **Standard of Review**

Title 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214, authorizes a federal district court to entertain a petition for habeas corpus relief from a prisoner in state custody, "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). When determining the merits of a section 2254 petition, the district court applies the standard set forth in section 2254(d), which provides that the habeas petition of a person in State custody "shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim" is:

> (1) contrary to, or involves an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d) (1) and (2). Moreover, the factual determinations made by the state

court are presumed to be correct and are only rebutted upon presentation of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e) (1). Thus, when reviewing a petition for habeas relief, the federal court uses a "highly deferential lens." *DeCastro v. Branker,* 642 F.3d 442, 449 (4th Cir. 2011).

A claim is generally considered to have been "adjudicated on the merits" when it is "substantively reviewed and finally determined as evidenced by the state court's issuance of a formal judgment or decree." *Thomas v. Davis*, 192 F.3d 445, 455 (4th Cir. 1999). The "contrary to" and "unreasonable application" clauses of section 2254(d)(1) have separate and independent meanings. *Williams v. Taylor,* 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court decision warrants habeas relief under the "contrary to" clause "if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to the Supreme Court's." *Lewis v. Wheeler*, 609 F.3d 291, 300 (4th Cir. 2010) (quoting *Williams,* 529 U.S. at 405) (internal quotations omitted). A habeas writ may be granted under the "unreasonable application" clause if the state court "identifies the correct governing legal rule from the [Supreme] Court's cases but unreasonably applies it to the facts of the particular case." *Id.* at 300-01 (internal marks omitted).

Accordingly, the AEDPA limits the habeas court's scope of review to the reasonableness, rather than the correctness, of the state court's decision. A federal court may not issue a writ under this standard "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather the application must also be unreasonable." *Williams*, 529 U.S. at 365.

Here, Respondent has moved for summary judgment. (ECF No. 21). Summary judgment under Rule 56 of the Federal Rules of Civil Procedure "applies to habeas proceedings." *Brandt v. Gooding*, 636 F.3d 124, 132 (4th Cir. 2011) (quoting *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991)). Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] fact or facts are material if they constitute a legal defense, or if their existence or nonexistence might affect the result of the action, or if the resolution of the issue they raise is so essential that the party against whom it is decided cannot prevail." Charles Alan Wright, Arthur R. Miller &, Mary Kay Kane, *Federal Practice and Procedure*: *Civil* § 2725 (3d ed. 2005). On the other hand, a fact is not material when it is of no consequence to the outcome, or is irrelevant in light of the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Assertions of material facts must be supported by "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). In addition, only genuine disputes over material facts "will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). A dispute is "genuine" when "there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party." *Cox v. Cnty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001) (citing *Anderson*, 477 U.S. at 248).

Motions for summary judgment impose a heavy burden on the moving party as it must be obvious that no material facts are in dispute and no rational trier of fact could

find for the nonmoving party. *See Miller v. F.D.I.C.*, 906 F.2d 972, 974 (4th Cir. 1990). Nonetheless, the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent entry of summary judgment. *Anderson,* 477 U.S. at 252. While any permissible inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Anderson*, 477 U.S. at 249-50). With these standards in mind, the undersigned considers each ground raised by Hutchinson.

IV.    **Discussion**

    **A. Admission of 404(b) Evidence**

    In his first assignment of error, Hutchinson asserts that the trial court improperly admitted 404(b) evidence concerning the December 2000 and January 2001 incidents of violence that occurred at his residence. (ECF No. 3 at 13-22). While Hutchinson asserts that his federal constitutional rights were violated by the admission of other acts evidence, he primarily cites WVSCA decisions interpreting West Virginia Rule of Evidence 404(b) in support of his claim. (*Id.* at 17-21). He also cites a few decisions from federal courts of appeals interpreting Federal Rule of Evidence 404(b). (*Id.* at 21-22). However, Hutchinson fails to identify the clearly established federal law that was unreasonably applied by the state courts in admitting and approving the admission of this evidence.

    Hutchinson raised similar claims in his petition for direct appeal to the WVSCA and in his amended state habeas petition. (ECF No. 10-1 at 71-75, 194-200). While he

made passing mention of federal constitutional rights in his amended habeas petition, he failed to develop any substantive discussion of a federal constitutional right as it relates to the admission of other acts evidence under state evidentiary rules. (*Id.* at 194-200). As noted above, Hutchinson does the same in his filings with this Court. Consequently, Hutchinson has not developed any federal constitutional claim related to the admission of other acts evidence within the state courts or within this Court. *See Duncan v. Henry*, 513 U.S. 364, 366, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."). Instead, he apparently seeks to challenge the state court's application of state evidentiary rules, which is not within the province of federal habeas review. *See Burger v. Woods*, 515 F. App'x 507, 509 (6th Cir. 2013) ("Federal habeas courts do not review state-court rulings on state-law questions.") (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)); *Welsh v. Cartledge*, No. 4:13-296, 2014 WL 272108, at *6 (D.S.C. Jan. 24, 2014) (adopting report and recommendation wherein magistrate judge concluded that petitioner's challenge to state court's admission of 404(b) evidence was not cognizable in federal habeas); *Lucas v. McBride*, 505 F.Supp.2d 329, 354 (N.D.W.Va. 2007) (holding petitioner's challenge to state court's admission of 404(b) evidence was not cognizable on federal habeas review).

Nevertheless, a state court evidentiary ruling, in rare circumstances, may cross the federal due-process line. As the Fourth Circuit has recognized, "[i]n federal habeas actions, [federal courts] do not sit to review the admissibility of evidence under state law unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding." *Burket v. Angelone*, 208 F.3d 172, 186 (4th Cir. 2000).

"Something worse than a garden-variety violation of the standard of 404(b) must be shown" to establish a due process violation. *Watkins v. Meloy*, 95 F.3d 4, 7 (7th Cir. 1996); *see also Burger*, 515 F. App'x at 510. "It is only in circumstances impugning fundamental fairness or infringing specific constitutional protections that a federal question is presented." *Barbe v. McBride*, 521 F.3d 443, 452 (4th Cir. 2008) (quoting *Spencer v. Murray*, 5 F.3d 758, 762 (4th Cir. 1993)) (markings omitted).

In its amended habeas order, the state circuit court held that evidence of the two prior violent incidents in the home was properly admitted. (ECF No. 10-1 at 280-81). As noted above, the WVSCA adopted that amended order on appeal. (ECF No. 10-2 at 53-54). Understandably, neither court addressed any federal due process issue because Hutchinson only mentioned the term "due process" in his briefs and did not supplement his invocation of the due process doctrine with any discussion of the issue or citation of relevant law. Even assuming, *arguendo*, that the trial court's admission of the evidence was erroneous, and looking past Hutchinson's failure to adequately develop his claim in both state and federal court, the admission of the evidence did not violate Hutchinson's federal due process rights. First, Hutchinson received a hearing prior to the admission of the evidence at trial. Second, the trial court provided a detailed limiting instruction to the jury regarding the evidence, which the jury is presumed to have followed. Third, defense counsel adequately cross-examined Jessica in relation to the two incidents at both the 404(b) hearing and at trial. Fourth, the January 2001 incident, as described by Jessica, was not portrayed as involving a severe level of violence, even though the police were called, which greatly limits its prejudicial nature. Fifth, Hutchinson was able to testify and did testify that Jessica's recollection of the incidents was incorrect. Finally, the evidence was not so compelling or prejudicial as to deny Hutchinson a

constitutionally fair proceeding. Indeed, the prosecution's most damning evidence against Hutchinson related to the evening of the crimes, not to other acts of violence committed by Hutchinson. In sum, the introduction of 404(b) evidence did not render Hutchinson's trial fundamentally unfair.

Having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that the admission of the other acts evidence was not so fundamentally unfair as to deny Hutchinson due process of law. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on ground one of the petition.

### B. Exclusion of Rebuttal Testimony

In his next claim, Hutchinson claims that the trial court violated his federal constitutional rights by excluding rebuttal testimony regarding the December 2000 incident. (ECF No. 3 at 24-26). Hutchinson insists that his mother would have testified that after the December 2000 incident, Jessica and Ms. Rigney told Ms. Hutchinson that Ms. Rigney had started the fight with Hutchinson, and that the fight occurred in the living room. (*Id.* at 24-25). According to Hutchinson, this evidence would have rebutted Jessica's account of the altercation and corroborated Hutchinson's testimony. (*Id.* at 27). Hutchinson essentially argues that his rights to compulsory process and due process were violated when the rebuttal evidence was excluded because his right to call witnesses in his defense was obstructed. (*Id.* at 28).

In denying an identical claim, the state circuit court found that the trial court did not err in excluding hearsay statements from an unavailable witness. (ECF No. 10-1 at 281). The court also pointed out that Hutchinson had the opportunity to cross-examine Jessica, who described the two prior incidents of violence. (*Id.*) Finally, the circuit court

held that "any error in the admissibility of the testimony of certain defense witnesses d[id] not implicate [Hutchinson's] constitutional rights." (*Id.* at 282).

Similar to his previous ground for relief, Hutchinson again challenges the evidentiary rulings of the trial court. Such a claim typically faces a "steep climb" to warrant relief. *Burger*, 515 F. App'x at 509-10. However, where a petitioner complains of the exclusion of evidence in support of his defense rather than the admission of evidence against him, a petitioner's challenge finds more solid constitutional ground. *See Watkins*, 95 F.3d at 6 ("When a state keeps out evidence favorable to the criminal defendant or prevents him from cross-examining the prosecution's witnesses, it runs the risk of being found to have prevented him from defending himself or confronting the witnesses against him . . . ."). The constitutional foundation for such a challenge exists because a defendant's "right to due process guarantees 'the right to a fair opportunity to defend against the State's accusations . . . .'" *United States v. Jinwright*, 683 F.3d 471, 482-83 (4th Cir. 2012) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 294-95 (1973)). In other words, a criminal defendant has the right to present a defense, including offering the testimony of witnesses and compelling witness attendance. *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). However, that right is not unlimited. *See United States v. Scheffer*, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (recognizing defendant's right to present relevant evidence is subject to reasonable restrictions). "A defendant's interest in presenting such evidence may . . . bow to accommodate other legitimate interests in the criminal trial process." *Id.* (citations and markings omitted). The exclusion of evidence as a result of accommodating these other legitimate interests is only unconstitutional where the exclusion "has infringed upon a weighty interest of the accused" or "significantly

30

undermined the fundamental elements of the defendant's defense." *Id.* at 308, 315; *see also Fry v. Pliler*, 551 U.S. 112, 124, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007) (Stevens, J., concurring in part and dissenting in part) ("[D]ue process considerations hold sway over state evidentiary rules only when the exclusion of evidence undermines fundamental elements of the defendant's defense.") (citation and markings omitted).

To begin, it is not entirely clear what specific ground the trial court relied on in sustaining the prosecution's objection to Ms. Hutchinson's testimony regarding Ms. Rigney's statements. The prosecution objected on hearsay grounds as Ms. Hutchinson began describing a phone conversation between Jessica and Ms. Hutchinson. (ECF No. 10-4 at 231). At a sidebar conference, defense counsel then represented that the conversation was actually between Ms. Rigney and Ms. Hutchinson. (*Id.* at 233). Defense counsel did the same when later proffering the evidence. (*Id.* at 251). At the sidebar, the trial court asked whether by presenting the hearsay testimony, defense counsel would be "visiting the Dead Man Statute." (*Id.* at 234). Defense counsel replied that he did not think so and that the basis for admitting the statements was "unavailability." (*Id.*) The court then stated that he was "going to sustain the objection if that's the basis." (*Id.*) As such, it appears that the testimony was excluded on hearsay grounds. Hutchinson maintains that the evidence should have been admitted based on West Virginia Rule of Evidence 804(a)(4), West Virginia Rule of Evidence 806, and the curative admissibility rule described in *State v. Guthrie*, 461 S.E.2d 163, 188 (W. Va. 1995).

Without addressing the propriety of the exclusion of the hearsay testimony that defense counsel hoped to elicit from Ms. Hutchinson, Hutchinson cannot establish that the exclusion of the evidence "infringed upon a weighty interest" or "significantly

undermined the fundamental elements of his defense," so as to result in a violation of due process. *Scheffer*, 523 U.S. at 308, 315. Evidence that Ms. Rigney actually started the fight in December 2000 and that the fight occurred in the living room of the home is somewhat tangential, and certainly not fundamental to Hutchinson's insanity defense. While Hutchinson possessed an interest in rebutting Jessica's account of how Ms. Rigney described the incident, defense counsel was able to cross-examine Jessica on her recollection of the event and Hutchinson was also able to describe how he remembered the incident when he testified. Furthermore, while the level of violence between Hutchinson and Ms. Rigney in December 2000 differs based on whose testimony is to be believed, Hutchinson still admitted that he punched and injured Ms. Rigney during the incident. Additional, cumulative testimony that Ms. Rigney began the fight by striking Hutchinson before he struck her would not garner much more sympathy for Hutchinson, and as alluded to above, such testimony had no bearing on Hutchinson's overall insanity defense. Hutchinson was neither foreclosed from presenting the defense that he and his counsel wished to present nor prevented from rebutting Jessica's testimony regarding the December 2000 incident in ways other than Ms. Hutchinson's hearsay testimony. For these reasons, Hutchinson's claim is unpersuasive.

Having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that the exclusion of the hearsay testimony did not deny Hutchinson his right to due process or his right to present a defense. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on ground two of the petition.

### C. Ineffective Assistance of Counsel

In his third assignment of error, Hutchinson alleges that his trial counsel was ineffective for a number of reasons. (ECF No. 3 at 30-36). Each one of those sub-grounds for relief is addressed individually below. Preliminarily, the undersigned will discuss the standard governing ineffective assistance of counsel claims under the AEDPA.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant "the right to the effective assistance of counsel." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). While "assistance which is ineffective in preserving fairness does not meet the constitutional mandate ... defects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation." *Mickens v. Taylor,* 535 U.S. 162, 166, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2001). To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-88, 694. When reviewing counsel's performance, the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 690. Moreover, counsel's performance should be assessed with "a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time," and a court should not allow hindsight to alter its review. *Wiggins v. Smith,* 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). In addition, trial strategy devised after investigating the law and facts is "virtually unchallengeable." *Bell v. Evatt*, 72 F.3d 421, 429 (4th Cir.

1995).

In a section 2254 proceeding, the standard of review differs somewhat from the standard used in the direct review of a *Strickland*-based challenge. *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 785, 178 L.Ed.2d 624 (2011). "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem review is doubly so." *Id.* at 788 (internal citations and quotations omitted). "'Surmounting *Strickland's* high bar is never an easy task[;]' ... Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id.* (quoting *Padilla v. Kentucky,* 559 U.S. 356, 371, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010)). The question, then, is not "whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* at 788. With this standard in mind, the undersigned turns to Hutchinson's specific claims of ineffective assistance of counsel.

### 1. Change of Venue

In his first claim of ineffective assistance of counsel, Hutchinson argues that his counsel was ineffective in failing to move for a change of venue based on the pretrial publicity that his case received. (ECF No. 3 at 31). The state circuit court's opinion is unclear as to whether it addressed this claim on the merits. (ECF No. 10-1 at 284). This is likely due to Hutchinson raising this claim of ineffective assistance of counsel in his discussion of his claim asserting that the trial court should have *sua sponte* ordered a change of venue and not in the section of his state habeas brief addressing ineffective assistance of counsel. (*Id.* at 221). In discussing this claim, the state circuit court stated that "whether trial counsel should have made [a motion to change venue] because of pretrial publicity is a matter that should be covered under the issue of the possibility of

34

ineffective assistance of counsel." (*Id.* at 284). In a prior section of its opinion, the state circuit court denied all of the other ineffective assistance of counsel claims raised by Hutchinson based on Hutchinson's failure to establish prejudice under the *Strickland* standard. (*Id.* at 277-78). Accordingly, it is unclear whether the state court denied the claim, as it did all other ineffective assistance of counsel claims, or ignored the claim because of its presentation in the incorrect section of Hutchinson's state habeas brief. Regardless, even applying *de novo* review rather than AEDPA deference, the claim fails.

First, Hutchinson has not established that grounds for a motion for change of venue even existed. Hutchinson asserts that the local media reported on the case regularly from the time of the murder until his trial. (ECF No. 3 at 42). However, Hutchinson has not provided any evidence of the purported pre-trial media coverage. Furthermore, Hutchinson has not demonstrated that the trial court would have granted a change of venue under the state law standard for such a request. In West Virginia, "[w]idespread publicity, of itself, does not require change of venue, and neither does proof that prejudice exists against an accused, unless it appears that the prejudice against him is so great that he cannot get a fair trial." *State v. Gangwer*, 286 S.E.2d 389, 392 (W. Va. 1982). Hutchinson has not pointed to anything in the record demonstrating prejudice against him, and he relies on widespread publicity, by itself, as the basis for claiming that his counsel should have moved for a change of venue. Under the standard recited in *Gangwer*, it is, at best, unclear whether a motion for change of venue would have been successful. Additionally, voir dire did not reveal any prejudice on the part of any potential juror against Hutchinson based on pretrial publicity. As such, defense counsel did not act unreasonably in abstaining from filing a motion for a change of venue. *See Graybill v. Clarke*, No. 7:11-cv-00331, 2012 WL 3133691, at *21 (W.D.Va.

July 31, 2012) (denying similar ineffective assistance of counsel claim where petitioner failed to present evidence of "widespread prejudice on the part of the jury").

Finally, Hutchinson cannot establish prejudice. "In order to prove prejudice, [Hutchinson] would have to prove that had the venue of his trial been moved, he would have been acquitted." *Blackmon v. Ballard*, No. 2:09-cv-00789, 2010 WL 3703031, at *37 (S.D.W.Va. Aug. 2, 2012) report and recommendation adopted by 2010 WL 3702705 (S.D.W.Va. Sept. 13, 2010). Hutchinson has not done so, and given the amount of evidence against him, cannot do so. Consequently, his claim fails.

### 2. Reasonable Investigation

Hutchinson next contends that his counsel was ineffective for failing "to look into various aspects brought to his attention, or make reasonable investigation for possible exculpatory or mitigating evidence in [his] murder case." (ECF No. 3 at 31). As noted above, the state circuit court rejected all of Hutchinson's ineffective assistance of counsel claims on the basis that he failed to establish the prejudice prong of *Strickland.* (ECF No. 10-1 at 277-78). The court found that even if counsel were ineffective, there was not a reasonable probability that the result of the proceeding would have been different but for counsel's errors. (*Id.*)

Hutchinson's claim lacks specificity, and thus, it lacks merit. Hutchinson has not described what "aspects" were brought to his counsel's attention that counsel failed to investigate. Moreover, Hutchinson has not identified what exculpatory or mitigating evidence would have been produced had a reasonable investigation been conducted (assuming that one was not). Furthermore, without knowing what evidence would have been uncovered, there is no way of telling how Hutchinson suffered any prejudice. As such, Hutchinson's claim cannot succeed. *Bassette v. Thompson*, 915 F.2d 932, 940-41

(4th Cir. 1990) (recognizing that such general claims regarding investigation cannot establish ineffective assistance of counsel). Finally, the record demonstrates that defense counsel investigated this case as well as they could under the circumstances. Counsel requested discovery, attempted to contact witnesses, requested a competency evaluation, and met and spoke with Hutchinson concerning the case. Hutchinson has not specifically established what more counsel could have done in their investigation. Therefore, this claim likewise fails.

### 3. Failure to Obtain the Testimony of a Psychiatrist for Sentencing Proceeding

Hutchinson next argues that counsel was ineffective when he failed to obtain a psychiatrist to testify at his sentencing hearing. (ECF No. 3 at 32). This claim was also rejected by the state circuit court under *Strickland* on prejudice grounds. Again, as with the previous claim, Hutchinson fails to establish what the testimony of this hypothetical expert would have been and how this hypothetical testimony would have affected the outcome of his sentencing proceeding. *See Bassette*, 915 F.2d at 941 (recognizing that a petitioner "cannot establish ineffective assistance of counsel under *Strickland v. Washington* on the general claim that additional witnesses should have been called in mitigation" at sentencing).

In addition, at the sentencing hearing, defense counsel specifically asked the jury to recall and consider Dr. Webb's testimony in making their recommendation. The jury had already listened to Dr. Webb's testimony regarding Hutchinson's mental illness shortly before deliberating as to Hutchinson's guilt, and counsel was not ineffective for failing to recall Dr. Webb to provide cumulative testimony or rehash his prior testimony. *See Bell v. Cone*, 535 U.S. 685, 699, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (holding

that counsel was not ineffective for failing to recall medical experts at sentencing phase where "counsel reasonably could have concluded that the substance of their testimony was still fresh to the jury"); *McNeill v. Polk*, 476 F.3d 206, 217 (4th Cir. 2007) (holding counsel not ineffective in refraining from presenting same evidence of diminished capacity at sentencing proceeding that was presented at trial); *Fisher v. Lee*, 215 F.3d 438, 452 (4th Cir. 2000) (holding cumulative testimony by psychiatrist would not have had any probability of changing outcome of sentencing proceeding). Because Hutchinson has not established what the testimony of an additional psychiatrist would have been or that it would have differed from Dr. Webb's testimony, he cannot demonstrate prejudice. Therefore, his claim does not warrant relief.

### 4. Failure to Disqualify Two Prospective Jurors

Next, Hutchinson claims that counsel was ineffective for failing to disqualify Ms. Heck and Ms. Millne from the jury because they had social relationships with potential witnesses for the prosecution. (ECF No. 3 at 33-34). As relevant to Hutchinson's claims, Ms. Heck and Ms. Millne both stated during voir dire that they knew former Detective Murphy. (ECF No. 10-3 at 31, 33). Ms. Heck stated that her husband knew Detective Murphy, but "not really personally." (*Id.* at 33). Ms. Millne stated that she knew Detective Murphy because they went to the same church. (*Id.* at 31). Both jurors asserted that they could evaluate former Detective Murphy's testimony in a fair and impartial manner. (*Id.*) Ms. Millne also stated that she knew Officer Zickefoose, but again affirmed that she could weigh the officer's testimony fairly and impartially. (*Id.* at 31). Shortly after the jury was seated and trial began, Ms. Heck realized that she knew two more potential prosecution witnesses: Kathy Samples and Anthony Jenkins. (*Id.* at 126). During additional voir dire outside of the presence of the other jurors, Ms. Heck

stated that she could evaluate both witnesses' testimony as if she did not know them and that she would not be likely to believe their testimony based on her relationships with them. (*Id.* at 127-30). Defense counsel did not object to Ms. Heck remaining on the jury. (Id. at 131). Officer Zickefoose, Ms. Samples, and Mr. Jenkins did not testify at Hutchinson's trial. The state circuit court rejected this claim because Hutchinson could not establish prejudice.

The Sixth Amendment mandates that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. Const. amend. VI. The guarantee of a fair trial by an impartial jury has been incorporated to the states through the Fourteenth Amendment. *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). "The Supreme Court has interpreted [the Sixth Amendment] to mean that a criminal defendant has a constitutional right to a jury free from prejudice and 'capable and willing to decide the case solely on the evidence before it.'" *Gardner v. Ozmint*, 511 F.3d 420, 424 (4th Cir. 2007) (quoting *Smith v. Phillips*, 455 U.S. 209, 217, 102 S .Ct. 940, 71 L.Ed.2d 78 (1982)). Unless evidence indicates otherwise, jurors are presumed to be impartial. *United States v. Jones*, 200 F. App'x 231, 232 (4th Cir. 2006).

After reviewing the transcript of jury selection, it is apparent that any relationships between the jurors and the prosecution's potential witnesses were less than familiar. Moreover, Ms. Heck and Ms. Millne both affirmed that their relationships with the prosecution's potential witnesses would not affect how they would evaluate the witnesses' testimony. Thus, defense counsel's representation was not objectively unreasonable in refraining from disqualifying Ms. Heck and Ms. Millne. *See, e.g.*, *Morgan v. Ballard*, No. 2:13-20212, 2014 WL 4629413, at *20 (S.D.W.Va. Aug. 12, 2014) (report and recommendation finding that where petitioner failed to establish

jurors were biased, counsel was not ineffective for failing to seek their exclusion). Furthermore, the state court's conclusion that Hutchinson failed to demonstrate prejudice as to this claim was not an unreasonable application of clearly established federal law; particularly, when three of the four witnesses known to the two jurors did not testify, and the fourth witness was nothing more than a mere acquaintance. Therefore, Hutchinson's claim does not warrant relief.

### 5. Failure to Obtain Grand Jury Transcript

Hutchinson also claims that counsel was ineffective for failing to obtain a copy of the grand jury transcript in his case. (ECF No. 3 at 34). The circuit court rejected this claim on prejudice grounds. As with many of his other ineffective assistance of counsel claims, Hutchinson fails to explain how this action by defense counsel would have aided his defense. Other than making the blanket statement that defense counsel should have obtained the grand jury transcript, he has not explained what helpful information was contained in the transcript and how he was prejudiced by counsel's decision not to obtain that information. As such, the state court's conclusion that Hutchinson failed to demonstrate prejudice as to this claim was not an unreasonable application of clearly established federal law.

### 6. Failure to Object to Confrontation Clause Violation

Hutchinson next argues that his counsel was ineffective when counsel failed to object to Jessica's refusal to look at Hutchinson or mention his name while testifying. (ECF No. 3 at 34). Hutchinson claims that Jessica "hid behind [the trial court] bench so [he] could not see her, refusing to even lean closer to the microphone, making her identification of [him] impossible." (*Id.*) In support of his position, Hutchinson points to a September 5, 2001 newspaper article in the Herald-Dispatch wherein the author states

that Jessica "never once looked at Hutchinson or even mentioned his name. She hid behind [the trial court's] bench so he could not see her, refusing to even lean in closer to the microphone." (ECF No. 19 at 15). Hutchinson also cites *Coy v. Iowa*, 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), to bolster his claim. In that case, the Supreme Court held that the defendant's right to confrontation was violated where a screen and special courtroom lighting were used to prevent the minor victim from seeing the defendant during the victim's testimony and the screen only permitted the defendant to "dimly" perceive the victim while testifying. *Id.* at 1014-15, 1022. The Court reasoned that the Confrontation Clause of the Sixth Amendment "guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." *Id.* at 1016.

In this case, no mechanism was utilized to prevent Hutchinson and his counsel from viewing Jessica during her testimony, other than possibly the witness's choice of posture, making *Coy* factually distinguishable. Contrary to Hutchinson's assertions, Jessica identified Hutchinson during her testimony. (ECF No. 10-3 at 165). She also repeatedly affirmed that the person she was talking about while describing the events of February 9 was Hutchinson. (*Id.* at 158, 161, 162). While the Confrontation Clause may require a face-to-face meeting between a criminal defendant and an accuser in court, that guarantee does not mandate a staring contest. *See Coy*, 487 U.S. at 1019 ("The Confrontation Clause does not, of course, compel the witness to fix his eyes upon the defendant; he may studiously look elsewhere, but the trier of fact will draw its own conclusions."). Here, Jessica testified in front of the jury without any artificial visual obstruction. *Cf. United States v. Levenite*, 277 F.3d 454, 465 (4th Cir. 2002) (applying plain error analysis and rejecting claim that defendant's Sixth Amendment rights were violated when they, as distinct from counsel, could not see the faces of witnesses

testifying against them due to number of defendants at trial and size of courtroom); *United States v. Iron Moccasin*, 878 F.2d 226, 230 (8th Cir. 1989) (distinguishing *Coy* and finding no plain error where easel blocked defendant's view of witness). The trial court did not prevent Hutchinson from observing or attempting to look at Jessica. Furthermore, Hutchinson has not cited any clearly established federal law, other than *Coy*, that he alleges was unreasonably applied by the state courts in rejecting his claim. Finally, as the state courts concluded, Hutchinson has not established prejudice under the *Strickland* standard in regard to this claim. Even assuming a violation of the Confrontation Clause and entirely disregarding Jessica's testimony under *Coy*, which may not be required here,[8] there was very similar testimony by Mr. Ford at Hutchinson's trial, and more than sufficient evidence existed to convict Hutchinson without Jessica's testimony. As such, this claim does not warrant relief.

### 7.  Failure to Move the Trial Court to Compel an Interview with Government Witnesses

In his next claim of ineffective assistance of counsel, Hutchinson asserts that trial counsel was deficient in failing "to motion the Court to compel an interview with Government witnesses when there [*sic*] testimony was different from there [*sic*] pretrial statements" to the police. (ECF No. 3 at 34). While Hutchinson does not directly identify which witness he wishes counsel would have moved the court to permit them to interview, it is likely that Hutchinson means Jessica. (ECF No. 11-1 at 30). Mr. Laishley testified at Hutchinson's state habeas hearing that he made requests to interview Ms. Rigney's children, but he was not permitted to do so. (ECF No. 10-5 at 201-02). At Hutchinson's pretrial hearing on August 24, 2001, Mr. Laishley stated that he had a

---

[8] *See United States v. Kaufman*, 546 F.3d 1242, 1258 (8th Cir. 2008) (holding that testimony of witnesses could be considered in prejudice analysis where violation of Confrontation Clause existed, but was less severe than violation that occurred in *Coy*).

duty to contact Jessica before trial to speak with her, and the prosecutor responded that Jessica did not wish to speak with Hutchinson's attorneys. (ECF No. 10-2 at 62). The court resolved the issue by instructing the prosecutor to set up a telephone call between defense counsel and Ms. Rigney's children. (*Id.* at 62-63). While Mr. Laishley did not move to compel an interview with Jessica, he requested that the trial court require the prosecutor to establish contact between defense counsel and Jessica, and the trial court obliged. If Jessica did not wish to speak with defense counsel, which according to the prosecution and Mr. Laishley, she did not, there was little defense counsel could do. *See McCabe v. North Carolina*, 314 F. Supp. 917, 921 (M.D.N.C. 1970) ("[W]hile it is true that any defendant has the right to attempt to interview any witness he desires, it is likewise true that any witness has the right to refuse to be interviewed, if he so desires.").

In addition, Hutchinson has not explained how an interview with Jessica before trial would have aided his defense, which alone defeats his claim. *See Beaver v. Thompson*, 93 F.3d 1186, 1195 (4th Cir. 1996) (recognizing that habeas petitioner must proffer what favorable evidence or testimony would have been produced had counsel acted reasonably). The record reflects that defense counsel was aware of prior inconsistent statements made by Jessica at the time of trial and that defense counsel adequately cross-examined her on those inconsistent statements. For example, during defense counsel's cross-examination of Jessica, counsel pointed out that during an interview with HPD Detective Sperry on February 20, 2001, Jessica stated that she did not see a knife in Hutchinson's hand on February 9. (ECF No. 10-3 at 166). On redirect examination, Jessica stated that she was absolutely sure that she saw a knife in Hutchinson's hand on February 9, 2001, and that she was still upset over her mother's

death when she was interviewed by Detective Sperry, which caused her to not remember certain things. (*Id.* at 174-75). There is no reason to believe that any additional, beneficial evidence would have been discovered had defense counsel moved to compel an interview of Jessica before trial. Furthermore, the impact of defense counsel's cross-examination of Jessica may have been lessened had defense counsel alerted her in a pretrial interview to the inconsistency between her statements allowing her more time to think of an explanation for any inconsistencies. Consequently, the state court did not unreasonably apply *Strickland* in rejecting Hutchinson's claim.

### 8. *Failure to Object to Inappropriate Behavior of Prosecution Witnesses*

In his last claim of ineffective assistance of counsel, Hutchinson asserts that counsel was ineffective by failing to object to the inappropriate behavior of the prosecution's witnesses. (ECF No. 3 at 35). Specifically, Hutchinson argues that defense counsel should have objected to Angela Rigney's two alleged outbursts. (*Id.*) Hutchinson claims that Angela began screaming and crying during Jessica's testimony and that "she had to be carried out of the courtroom." (*Id.*) Hutchinson also insists that Angela screamed and cried in the hallway next to the courtroom during Dr. Sabet's testimony. (*Id.*) As noted above, the record does not reflect what occurred during these alleged outbursts or that they even occurred in the way that Hutchinson describes. The trial transcript reflects that Mr. Turner inquired at the conclusion of Dr. Sabet's testimony whether he needed to object to some unspecified conduct, but Mr. Laishley stated that the trial court "effectively took care of th[e] situation immediately upon its happening." (ECF No. 10-4 at 115).

Hutchinson has failed to establish the factual predicate for his claim because he has presented no evidence of the alleged outbursts, other than his description of them in his brief. (ECF No. 3 at 35). Even Hutchinson's depiction of Angela's conduct does not describe the outbursts as lengthy, accusatory, or insulting. One could understand why Angela would become upset when hearing the details of her mother's murder while sitting in the same room with the man accused of committing the crime. If the outbursts did indeed occur, Hutchinson has not established that his counsel acted unreasonably in failing to object, particularly if counsel believed that the trial court handled the situation properly. Furthermore, Hutchinson has not demonstrated that there was a reasonable probability that the outcome of his trial would have been different had counsel objected to Angela's alleged outbursts. *See Coleman v. Giles*, 140 F. App'x 895, 899 (11th Cir. 2005) (rejecting similar claim where, assuming counsel erred in not objecting to the outburst, petitioner could not demonstrate prejudice). For these reasons, Hutchinson has failed to establish that the state court unreasonably applied *Strickland* in denying this claim.

### 9. Ineffective Assistance of Counsel Conclusion

Having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that Hutchinson has failed to establish that the state court's denial of his claim for ineffective assistance of counsel was an objectively unreasonable application of, or contrary to, clearly established federal law. Additionally, the undersigned **PROPOSES** that the District Court **FIND** that Hutchinson has failed to establish a meritorious ineffective assistance of counsel claim related to counsel refraining from requesting a change of venue. Accordingly, the undersigned

**RECOMMENDS** that Respondent be granted summary judgment on ground three of the petition.

### D. Incompetent Psychological Evaluation

In his fourth ground for relief, Hutchinson contends that he was not given adequate access to competent evaluators for a determination of his competency, which violated his right to due process. (ECF No. 3 at 37). Hutchinson challenges Dr. Webb's qualification to render an opinion as to Hutchinson's competency at the time of the crimes and to stand trial. (*Id.* at 38). Hutchinson also contests the thoroughness of the evaluation that Dr. Webb performed. (*Id.*)

The state circuit court rejected Hutchinson's claim because the testimony of Hutchinson's "treating physician" (presumably Dr. Webb) was properly considered by the trial court and Hutchinson did not allege "any specific constitutional violation." (ECF No. 10-1 at 282-83). The state court was correct that Hutchinson did not allege any specific constitutional violation in his petition to that court, only a vague violation of his due process rights. (*Id.* at 213-19). In this proceeding, Hutchinson similarly fails to set forth any specific federal constitutional claim other than a broad due process claim. Still, the undersigned will address the more particular due process claim that Hutchinson attempts to put forth.

"It is well established that the Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial." *Medina v. California*, 505 U.S. 437, 439, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992). In order to effectuate that prohibition, due process requires that a state provide a defendant "access to procedures for making a competency evaluation." *Id.* at 449; *see also Hatfield v. Ballard*, 878 F. Supp. 2d 633, 655 (S.D.W.Va. 2012) ("It is axiomatic

46

that the conviction of an accused person while he is legally incompetent violates due process and that states must implement constitutionally adequate procedures to protect this right."). A defendant is entitled to a competency hearing not only to determine competency at the time of trial, but also to determine criminal responsibility at the time of the crime. *Bell v. Evatt*, 72 F.3d 421, 431 (4th Cir. 1995). Where a defendant is indigent[9] and he "demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake v. Oklahoma*, 470 US. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

In this case, the state ordered that Hutchinson undergo a competency evaluation by a psychiatrist and held a competency hearing after receiving Dr. Webb's report. After hearing testimony at the competency hearing from Dr. Webb and Ms. Hutchinson, the trial court found that Hutchinson was competent to assist counsel and stand trial, and that Hutchinson was competent at the time of the alleged crimes. Dr. Webb testified at trial as to his qualifications. (ECF No. 10-4 at 204-06). He stated that he attended medical school at West Virginia University, and he performed two years of residency in psychiatry there. (*Id.* at 204). He then worked one year at the University of Kentucky, and after that, in 1974, he entered private practice in the field of psychiatry, a specialty he continued to actively practice at the time of trial in 2001. (*Id.*) Dr. Webb also testified that he was board certified in the field of forensic psychiatry, which he described as "the interface between psychiatry and the law." (*Id.* at 204-05). Given these qualifications, it

---

[9] Hutchinson was apparently indigent at the time his counsel requested a competency evaluation as the record demonstrates that the West Virginia Public Defender Service was required to pay for the evaluation. (ECF No. 10-1 at 20). Furthermore, Hutchinson was appointed counsel for his state habeas proceedings due to his indigence. (*Id.* at 87).

is clear that Hutchinson's challenge to Dr. Webb's credentials is unfounded. As for the competency evaluation itself, Dr. Webb stated at the competency hearing that he formed his opinion as to Hutchinson's competency after reviewing records provided by Hutchinson's counsel and the trial court and after performing an interview and psychological testing of Hutchinson. The interview lasted approximately thirty to forty-five minutes. Dr. Webb also testified at the competency hearing that he had some familiarity with Hutchinson because he had previously performed a competency evaluation of Hutchinson in 1999. While Hutchinson may believe that the interview should have lasted longer, although he provides no basis for that assertion, or that Dr. Webb should have asked him more or different questions (such as questions about Albert Einstein or the depth of his paranoia), Dr. Webb asked Hutchinson the questions necessary for him to form an expert opinion as to Hutchinson's competency. After reviewing Dr. Webb's testimony from the competency hearing and at trial, the undersigned is convinced that Dr. Webb's evaluation of Hutchinson comported with due process principles. A constitutional violation does not exist merely because Hutchinson believes that Dr. Webb should have reached different expert opinions on the issues of competency. Hutchinson was afforded a competent psychiatrist who conducted an appropriate examination and provided reasoned opinions, which is all that due process requires.

Having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that Hutchinson has failed to establish that his due process rights were violated by the state's order for psychiatric evaluation and the evaluation being performed by Dr. Webb. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on ground four of the petition.

### E. Venue

In his fifth ground for relief, Hutchinson insists that the trial court should have *sua sponte* ordered a change of venue because pretrial publicity prevented him from receiving a fair and impartial trial in Cabell County. (ECF No. 3 at 42). Hutchinson asserts that local newspapers and television stations made the homicide investigation the "lead story" from the time of the murder until the trial and that this created a "tainted jury pool." (*Id.*) He asserts that good cause existed for a change of venue based on the publicity, local sympathy for the victim, and a hostile sentiment toward him. (*Id.* at 43).

The state circuit court rejected Hutchinson's claim and concluded that the trial court had no burden to *sua sponte* order a change of venue. (ECF No. 10-1 at 284). The court found that the jurors "underwent meaningful and effective voir dire." (*Id.*) Moreover, "[t]he jurors replied negatively as to whether they were prejudiced by media coverage, thus it was not a constitutional violation for the [trial court] to rely on those jurors' statements and seat them as jurors." (*Id.*)

"Due process requires that the accused receive a trial by an impartial jury free from outside influences." *Sheppard v. Maxwell*, 384 U.S. 333, 362, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). "Jurors are presumed to be impartial and only in extreme circumstances may prejudice to a defendant's right to a fair trial be presumed from the existence of pretrial publicity itself." *Jones*, 200 F. App'x at 232-33; *see also Wells v. Murray*, 831 F.2d 468, 472 (4th Cir. 1987) (recognizing the same). Where extreme circumstances and presumed prejudice are not found, a court should look to voir dire examination as the "metric of juror partiality" and determine whether a juror actually held a belief that would raise the prospect of impartiality. *Wallace v. Branker*, 354 F.

App'x 807, 821 (4th Cir. 2009) (citing *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975)). "If voir dire 'indicates no such hostility to [a defendant] by the jurors . . . as to suggest a partiality that could not be laid aside,' then pretrial publicity has not deprived the defendant of a fair trial." *Id.* (quoting *Murphy*, 421 U.S. at 800) (markings in original).

Hutchinson has not demonstrated that prejudice may be presumed in this case. There is nothing in the record suggesting that the pretrial publicity in this case was as pervasive and inescapable as that in *Sheppard*, where the Supreme Court presumed that prejudice resulted from the extreme and inflammatory publicity. 384 U.S. at 363. Without presumed prejudice, the undersigned must evaluate the evidence of actual prejudice as demonstrated through voir dire.

In this case, the jurors were questioned by the trial court during voir dire regarding whether they had read a story in the Huntington Herald Dispatch about the case on the morning that trial began. (ECF No. 10-3 at 5-6). None of the potential jurors acknowledged having read the story. (*Id.* at 6). The trial court went on to ask whether any of the potential jurors would have an issue with only considering evidence presented in the courtroom and not taking into account anything heard or read outside of the courtroom, including things that the potential jurors heard or read in the past. (*Id.*) None of the potential jurors responded that they would have an issue with that. (*Id.*) The trial court then asked another variation of the same question, again receiving a negative response from the potential jurors. (*Id.*) After the jury was seated, but before any evidence was introduced, the trial court instructed the jury not to read or watch outside sources, so as not to influence the jury's impartiality. (*Id.* at 58). After the first day of trial, the court instructed the jury to avoid the news throughout the trial. (*Id.* at 245). At

the conclusion of the second day of trial, the trial court gave the same instruction. (ECF No. 10-4 at 248).

The jurors at Hutchinson's trial are presumed to have been impartial, *Jones*, 200 F. App'x at 232-33, and they are presumed to have followed the court's instructions regarding outside sources of information. *Jones v. United States*, 527 U.S. 373, 394, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999). None of the jurors demonstrated any hesitancy with his or her ability to ignore information that he or she had heard about the case in the past. Even if the voir dire did not go into depth as to what information, if any, potential jurors had previously heard about the case, inadequate voir dire alone is insufficient to demonstrate juror impartiality. *Wells*, 831 F.2d at 472. Absent evidence of voir dire answers that establish juror partiality, Hutchinson cannot demonstrate that he was denied a fair trial due to any pretrial publicity. *See id.* ("[I]t is not sufficient to simply allege adverse publicity without a showing that the jurors were biased thereby.") (citations and markings omitted).

Having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that Hutchinson has failed to establish that the state court's conclusion that he was not denied a fair and impartial jury trial based on pretrial publicity was an objectively unreasonable application of, or contrary to, clearly established federal law. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on ground five of the petition.

### F. Cumulative Error

In his sixth claim for relief, Hutchinson alleges that "the cumulative effects of numerous errors in [his] case tainted the entire proceeding." (ECF No. 3 at 44). Hutchinson contends that "when you consider all [of] the errors set forth in [his]

51

petition for a writ of habeas corpus, [he] is entitled to a reversal of his conviction on the issue of cumulative error." (*Id.*) Because, as discussed throughout this PF&R, the undersigned does not find any errors of constitutional magnitude occurred in his case, Hutchinson is not entitled to relief on this ground. *See Fisher v. Angelone*, 163 F.3d 835, 853 n.9 (4th Cir. 1998).

Having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that Hutchinson has failed to establish that any cumulative error exists warranting relief. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on ground six of the petition.

### G. Sufficiency of the Evidence

Although labeled as an actual innocence claim, Hutchinson's seventh ground for relief is more properly considered as a claim that there was insufficient evidence to prove his guilt beyond a reasonable doubt. (ECF No. 3 at 44). Hutchinson believes that the prosecution's theory of the crime, that he would stab Ms. Rigney with her children nearby, flee, and then voluntarily return later, is incompatible with "willful, deliberate, and premeditated murder." (*Id.* at 46). He also argues that the prosecution failed to introduce adequate scientific evidence to support his convictions. (*Id.*) For example, Hutchinson takes issue with the prosecution failing to request any blood spatter tests and the West Virginia Biochemistry Laboratory only testing fifteen of the alleged fifty-six pieces of physical evidence collected throughout the investigation. (*Id.*) He also stresses that no usable fingerprints were found on the murder weapon, a fact which, according to him, raises a reasonable doubt by itself. (*Id.* at 49). In addition, Hutchinson opines that the crimes could not have happened in the manner that the prosecution described at trial because if he had pinned Ms. Rigney up against the wall to stab her,

the stab wounds would have been lower and at an upward angle, rather than in her chest and straight as Dr. Sabet described. (*Id.* at 47). Hutchinson also argues that the defensive wound on Ms. Rigney's arm and the blood spatter evidence proves that Ms. Rigney was stabbed with an overhand strike. (*Id.* at 48). Additionally, Hutchinson points out that although Jessica claimed to have been stabbed by Hutchinson, her DNA was not found on the murder weapon. (*Id.*) Finally, Hutchinson argues that given the lack of blood evidence on his person when he was arrested, the more reasonable explanation of what happened was that he arrived after Ms. Rigney was stabbed, turned her over to listen for her heartbeat, and he was then struck from behind causing him to land on top of the victim. (*Id.* at 50).

Without much discussion, the state circuit court found that Hutchinson's claim did not implicate Hutchinson's constitutional rights, and thus was not subject to review in a habeas corpus proceeding. (ECF No. 10-1 at 286). The state circuit court therefore "found" the issue "against" Hutchinson. (*Id.*) Yet, Hutchinson did raise a due process claim pursuant to *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in his brief to the state circuit court, which went unaddressed by that court. (ECF No. 10-1 at 223, 285-86).

"[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a [state] criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *Jackson v. Virginia*, 443 U.S. at 315 (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). "To determine whether this due process right has been violated, the appropriate inquiry before the passage of AEDPA was a straightforward question of whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt. Now, under the AEDPA . . . we inquire whether a state court determination that the evidence was sufficient to support a conviction was an objectively unreasonable application of [the standard enunciated in] *Jackson*." *Williams v. Ozmint*, 494 F.3d 478, 489 (4th Cir. 2007) (internal citations and quotations omitted).

After considering the standard provided in *Jackson*, the undersigned concludes that Hutchinson's insufficiency of the evidence claim is without merit. Many of the issues raised by Hutchinson concern areas of expertise, e.g. blood spatter and wound direction, in which Hutchinson is not qualified to give opinions. Furthermore, throughout his state post-conviction proceedings, Hutchinson failed to offer any expert testimony from a qualified individual to support his theories regarding the physical evidence. As such, Hutchinson claims regarding blood spatter, wound direction, and the relative positions of the parties are wholly inadequate to mount a challenge to his convictions.

As for Hutchinson's complaints regarding the DNA and fingerprint evidence, there was testimony throughout the trial explaining both. In regard to the former, a number of witnesses testified as to the demands faced by the state laboratory in testing for DNA evidence and Corporal Castle explained the process for selecting which evidence samples are ultimately tested. In regard to the latter, Corporal Castle explained that there were no usable fingerprints found on the knife as a result of the amount of blood contained on the knife. Corporal Castle also revealed that it was more common not to find fingerprints or to find unidentifiable fingerprints than it was to find usable fingerprints. Furthermore, in relation to Jessica's blood not being found on the murder weapon that was used to stab her, it is possible that her blood did not remain on the

knife or that the swab taken from the knife did not capture Jessica's blood. In any event, Jessica testified to being stabbed by Hutchinson and receiving stitches for her wound. She also displayed to the jury where she was stabbed. Viewing that evidence in the light most favorable to the prosecution, a rational trier of fact could find Hutchinson guilty of unlawfully wounding Jessica beyond a reasonable doubt.[10]

Turning to the first-degree murder conviction, there was abundant evidence on which a rational trier of fact could have found Hutchinson guilty of the offense beyond a reasonable doubt. Both Jessica and Mr. Ford recalled leaving their mother alone in a room with Hutchinson before the stabbing occurred. Both heard noises that caused them to enter the room where Hutchinson was present with Ms. Rigney's bloody body. Jessica witnessed Hutchinson holding a dagger and pinning Ms. Rigney up against the wall while Ms. Rigney was covered in blood. Mr. Ford also testified to seeing Hutchinson holding a dagger while Ms. Rigney lay on the floor bleeding. Both Jessica and Mr. Ford also recalled fighting with Hutchinson, and Hutchinson fleeing after Ms. Rigney was stabbed.

Not only did this eyewitness testimony support a conviction, physical evidence did as well. Ms. Rigney's blood was found on the knife that Jessica and Mr. Ford observed in Hutchinson's possession on the night of the murder and while he was in the room with Ms. Rigney. Dr. Sabet also confirmed that Ms. Rigney had three stab wounds

---

[10] West Virginia Code § 61-2-9(a) provides:

> If any person maliciously shoot, stab, cut or wound any person, or by any means cause him or her bodily injury with intent to maim, disfigure, disable or kill, he or she shall, except where it is otherwise provided, be guilty of a felony and, upon conviction, shall be punished by confinement in a state correctional facility not less than two nor more than ten years. If such act be done unlawfully, but not maliciously, with the intent aforesaid, the offender is guilty of a felony and, upon conviction, shall either be in a state correctional facility not less than one nor more than five years, or be confined in jail not exceeding twelve months and fined not exceeding $500.

to her chest, two of which were fatal, and these wounds were consistent with injuries that could be caused by the knife seen in Hutchinson's possession. Moreover, Ms. Rigney's blood was found on Hutchinson's chest, cheeks, and left thumbnail. The number of stab wounds established Hutchinson's premeditation given that he had time to weigh the consequences of his actions between the individual thrusts of the knife. Furthermore, Hutchinson's later statement to the police supports his conviction. He partially corroborated Mr. Ford's testimony by conceding that Mr. Ford had injured him in a struggle. Hutchinson also admitted that he and Ms. Rigney had been fighting on the night of the murder, and Hutchinson told Detective Murphy that Ms. Rigney told him to leave the home. Although Hutchinson claimed that he left immediately and only returned after being escorted back to the home, he did not effectively explain how Ms. Rigney's blood ended up on him if that version of the events were true. In addition, although Hutchinson had no burden to present such evidence, no other possible perpetrator with a motive to commit the stabbing was identified at trial. While Hutchinson testified that he did not stab Ms. Rigney, the jury obviously did not find his testimony credible given the overwhelming evidence contradicting his version of what occurred.

As for Hutchinson's mental state at the time of the crimes, Dr. Webb opined that Hutchinson was competent at the time of the crimes based on police reports, psychological testing, and Hutchinson's statements during a half-hour to forty-five minute interview. On the subject of intoxication, Dr. Webb testified that those who regularly consume alcohol can adequately function with much higher levels of alcohol in their system. Detective Murphy described Hutchinson as "in control and lucid" during an interview subsequent to the crimes. Hutchinson was able to recall a number of details

concerning events directly after he committed the crimes. Officer Compton described Hutchinson as less intoxicated after the crimes when compared to Hutchinson's level of intoxication earlier in the day. Hutchinson also admitted during trial that he understood that it was wrong to commit a violent act against another person. Finally, he acknowledged that he did not have delusions related to Ms. Rigney and that he did not remember feeling as if any being were after him on February 9. Given this evidence, and viewing it in the light most favorable to the prosecution, a rational trier of fact could find Hutchinson guilty of first-degree murder beyond a reasonable doubt.

Having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that Hutchinson has failed to establish that there was insufficient evidence to support his conviction under the standard announced in *Jackson*. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on ground seven of the petition.

### H. Jury Instruction

In his eighth claim for relief, Hutchinson asserts that his due process rights were violated because the jury instructions "given on the issue of the effect of his intoxication" denied him a fair trial, and he was entitled to a *Brant* instruction. (ECF No. 3 at 52). Hutchinson argues that "[w]hen there is evidence of intoxication, the burden should be on the state to prove that the intoxication did not vitiate [his] premeditation and/or voluntariness of the act." (*Id.*) Hutchinson claims that the evidence of his consumption of alcohol and Zyprexa on the day of the crimes supports his position that he lacked premeditation. (*Id.*)

While Hutchinson does not describe what a *Brant* jury instruction is, even though he asserts he was entitled to one, such an instruction is used by West Virginia

state courts where a specific intoxication defense is presented. In *State v. Miller*, 401 S.E.2d 237, 245 n.7 (W.Va. 1990), the WVSCA supplied an example of a *Brant* instruction:

> The Court instructs the jury that it is no defense to a criminal act that the defendant's intoxication or use of drugs reduced his or her inhibitions, making the commission of a criminal act more likely. Further, a defendant's claim of intoxication or drug use can never be used as a defense when the defendant claims that his or her capacity to control his or her actions were diminished, but can only be used when there is demonstrated a total lack of capacity so that the defendant's bodily machine completely failed. Furthermore, for intoxication to be used as a defense where a weapon is used, it must affirmatively appear that the defendant had no predisposition to commit the crime or to engage in aggressive anti-social conduct which the intoxication merely brought to the forefront.

At trial, the prosecution requested that the trial court provide the jury with a *Brant* instruction. (ECF No. 10-4 at 133). However, defense counsel requested that the trial court provide an intoxication instruction from *State v. Keeton*, 272 S.E.2d 817 (W. Va. 1990), and the trial court agreed. (ECF No. 10-4 at 134-35). In *Miller*, the WVSCA also provided an example of a *Keeton* instruction:

> The Court instructs the jury that if you believe from the evidence that [the defendant] killed [the victim] as charged in the indictment, and at the time of such killing [the defendant] was under the influence of alcohol voluntarily taken by him, then such intoxication is in law no excuse for the act done by [the defendant] unless you believe from the evidence that such intoxication was such as did, in fact, deprive him at the time of the killing of the element of premeditation, in which event you can find [the defendant] guilty of no greater offense than murder in the second degree.

*Miller*, 401 S.E.2d at 245 n.8.

The state circuit court denied Hutchinson's claim and found that the *Brant* instruction was inapplicable to Hutchinson's case. (ECF No. 10-1 at 287). The court reasoned that the WVSCA had explicitly limited the application of the *Brant* instruction to cases where the facts were similar to those in *Brant*. Because the facts of

58

Hutchinson's case were dissimilar to those in the *Brant* case, the court found that the trial court correctly instructed the jury on the issue of intoxication.[11] However, the court did not address the federal due process issue raised by the claim.

The Fourth Circuit has recognized that state trial court jury instructions are "matters of state law and procedure not involving federal constitutional issues, and are therefore not reviewable in a federal habeas proceeding." *Nickerson v. Lee*, 971 F.2d 1125, 1137 (4th Cir. 1992) (internal quotations omitted), *abrogated on other grounds by Yeats v. Angelone*, 166 F.3d 255 (4th Cir. 1999). A "federal court may grant habeas relief only when the challenged instruction 'by itself so infected the entire trial that the resulting conviction violates due process,' it is not enough that the instruction was undesirable, erroneous, or even universally condemned." *Nickerson*, 971 F.2d at 1137 (quoting *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)). In addition, "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp*, 414 U.S. at 146-47.

Preliminarily, Hutchinson has not established the impropriety of providing the *Keeton* instruction rather than the *Brant* instruction. In fact, as the state circuit court concluded, the *Brant* instruction appears inapplicable to the facts of Hutchinson's case because, at the very least, Hutchinson appeared to have a predisposition to engage in crime or aggressive anti-social conduct against Ms. Rigney. Relative to any federal constitutional concerns, Hutchinson has not explained how the *Keeton* intoxication

---

[11] In *Miller*, 401 S.E.2d at 500, the WVSCA explained why the factual circumstances in *Brant* warranted an atypical instruction, stating as follows:

> In *Brant* the Court was faced with a unique set of facts which revealed a total absence of malice on the part of the defendant when he shot and killed a close friend. 162 W.Va. at 767, 252 S.E.2d at 903. Moreover, the evidence in that case demonstrated appellant's *total* lack of capacity due to the consumption of alcohol. *Id.*

instruction so infected his entire trial that his conviction violates due process. Hutchinson was provided with a jury instruction that accurately described West Virginia's law on intoxication. The instruction did not shift the burden of proof to Hutchinson on any of the elements of the offenses or relieve the prosecution from proving every element of the offense beyond a reasonable doubt. *Cf. Sandstrom v. Montana*, 442 U.S. 510, 523-24, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) (holding jury instruction violated defendant's due process rights where instruction relived state of its burden of proving every element of the offense beyond a reasonable doubt). Finally, to the extent that Hutchinson challenges the sufficiency of the evidence presented by the prosecution on the issue of premeditation, that claim was rejected above.

Having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that Hutchinson has failed to establish that the jury instructions at his trial violated due process. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on ground eight of the petition.

### I. Prosecutorial Misconduct

Hutchinson next alleges that the prosecutor committed various instances of misconduct. (ECF No. 3 at 53-55). First, Hutchinson contends that the prosecutor never gave defense counsel Polaroid photographs taken of him on February 9 in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). (ECF No. 3 at 53). Second, Hutchinson claims that Jessica committed perjury during the *LaRock* sentencing hearing when she stated that she was attending counseling to help with her depression because she later stated on a June 24, 2002 episode of the Montel Williams Show that she had not received counseling. (*Id.* at 54). Third, Hutchinson also asserts that Angela Rigney prejudiced his defense by her outbursts in front of the jury. (*Id.* at

55). Fourth, Hutchinson claims that Charles David Rigney and Tom Hager, relatives of the victims, attempted to intimidate Mr. Matt Taylor, Hutchinson's friend and a defense witness. (*Id.*) Finally, Hutchinson maintains that the prosecution "intentionally and maliciously contaminated [his] entire jury trial with unfair[,] irrelevant[,] and extremely prejudicial acts, and perjured testimony." (*Id.*)

The state circuit court denied Hutchinson's prosecutorial misconduct claim reasoning that any error asserted by Hutchinson "would not implicate [his] constitutional rights in such a manner as to be reviewable on habeas corpus or that they establish manifest injustice." (ECF No. 10-1 at 289). The state circuit court also pointed out that some of the claimed instances of misconduct did not implicate the prosecution, that the defense could have requested the Polaroid photographs, and that there was no evidence that the prosecution knew that Jessica was perjuring herself, if indeed she was committing perjury. (*Id.*)

To begin, as the state circuit court pointed out, some of the acts Hutchinson complains of cannot be attributed to the prosecution. For example, Angela's alleged outbursts and any intimidation of Mr. Taylor are not traceable to the prosecution. As such, they cannot be grounds for a prosecutorial misconduct claim, and those portions of Hutchinson's claim must be denied.

Turning to Hutchinson's *Brady* claim, under *Brady*, 373 U.S. at 87, a state violates a defendant's due process rights when it fails to disclose to the defendant "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." "*Brady* suppression occurs [even] when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor.'" *Youngblood v. West*

*Virginia*, 547 U.S. 867, 869-70, 126 S.Ct. 2188, 165 L.Ed.2d 269 (2006) (quoting *Kyles v. Whitley*, 514 U.S. 419, 438, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). In analyzing *Brady* claims, the Supreme Court has explained:

> There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). The petitioner carries the burden to establish these three elements. *Fullwood v. Lee*, 290 F.3d 663, 685 (4th Cir. 2002).

Under these standards, Hutchinson has failed to establish that a *Brady* violation occurred in his case. First, the Polaroid photographs taken of Hutchinson by Ms. Cathcart on February 9 were disclosed to Hutchinson at trial and admitted into evidence. (ECF No. 10-4 at 53-57). Where evidence forming the basis of a *Brady* claim is disclosed and admitted at trial, there is no *Brady* violation. *United States v. Einfeldt*, 138 F.3d 373, 377 (8th Cir. 1998). Second, Hutchinson has not explained how the evidence would have been favorable to him other than stating, in his lay opinion, that the photographs "would prove that [he] arrive[d] after the victim was stabbed." To the contrary, the photographs were unfavorable to Hutchinson because they depicted him with blood on his face, chest, and hands after the stabbing occurred. As for the second prong, Hutchinson has not demonstrated that the evidence was suppressed by the state; rather, as mentioned above, the evidence was introduced at trial and obtainable by Hutchinson. Finally, Hutchinson has not established that any prejudice occurred because he has not explained exactly how the photographs were favorable to him and the photographs were ultimately introduced at trial. Thus, Hutchinson's *Brady* claim

fails.

Hutchinson's claim related to Jessica's alleged perjury during the *LaRock* sentencing hearing similarly fails. In order for Hutchinson's claim to succeed, the Court must be convinced that representatives of the state knowingly used false testimony to obtain a conviction or used testimony that they should have known was false to obtain a conviction.[12] *Vinson v. True*, 436 F.3d 412, 420 n.3 (4th Cir. 2006) (citing *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)); *United States v. Kelly*, 35 F.3d 929, 933 (4th Cir. 1994). Hutchinson has not pointed to any record evidence showing that the prosecution knowingly used false testimony to obtain a life without mercy sentence or that the prosecution should have known that Jessica's testimony was false and used the testimony anyway to obtain a life without mercy sentence. In fact, it seems very likely that a person in Jessica's circumstances would attend some type of counseling, and it is unlikely that the prosecution asked that question without some prior indication by Jessica that she was indeed receiving counseling. In addition, assuming that Jessica subsequently made a contradictory statement, which is not a matter of record given that Hutchinson's only proof of the alleged statement is his own purported transcription of a segment of the television program taken without context, the statement was made  months after the prosecution had already elicited testimony about Jessica attending counseling. Therefore, the later statement has little bearing on whether the prosecution knew Jessica was attending counseling at the time of the

---

[12] Exactly what constitutes a representative of the state under *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), is unclear. Some courts have held that the prosecutor is merely a baseline and that other state actors, for example police officers, may fall within the category of representatives covered by *Napue. See, e.g., Limone v. United States*, 497 F. Supp. 2d 143, 218-19 (D. Mass. 2007) (collecting cases to support definition of state representative broader than just prosecutor). Nonetheless, the Court need not resolve the exact boundaries of the doctrine here because Jessica cannot be considered a representative of the state under any interpretation of the term.

*LaRock* hearing. Finally, given the abundance of other testimony related to the effects of Ms. Rigney's death on her children, the fact that Jessica may or may not have been attending counseling likely had little effect on the jury's sentencing recommendation. Thus, this portion of Hutchinson's claim is unavailing.

Finally, Hutchinson maintains that the prosecution "intentionally and maliciously contaminated [his] entire jury trial with unfair[,] irrelevant[,] and extremely prejudicial acts, and perjured testimony." (*Id.*) However, Hutchinson has not pointed to specific evidence to support his claim. To the extent that this claim encompasses evidentiary issues already discussed in this PF&R, the claim is unconvincing. To the extent that Hutchinson complains of other evidence introduced at his trial, he has not set forth the necessary factual predicate for his claim.

Having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that Hutchinson has failed to establish that the state court's denial of his prosecutorial misconduct claim was an objectively unreasonable application of, or contrary to, clearly established federal law. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on ground nine of the petition.

### J. Life without Parole and No Direct Appellate Review

Hutchinson next claims that the WVSCA violated his due process rights by refusing to review his petition for direct appeal. (ECF No. 3 at 56). Hutchinson avers that it is "unfair for the State of West Virginia to mete out its harshest punishment under the law to one of its citizens without mandatory appellate review when every other state . . . in the United States would afford his case review." (*Id.*) Hutchinson takes issue with the WVSCA's discretionary direct appellate review system for defendants

convicted and sentenced to life in prison without the possibility of parole. The state circuit court rejected Hutchinson's claim, citing *Billotti v. Legursky*, 975 F.2d 113 (4th Cir. 1992), for the proposition that the Fourth Circuit had "upheld" the WVSCA's discretionary appellate review system. (ECF No. 10-1 at 289).

The state circuit court was correct that the Fourth Circuit in *Billotti* rejected an identical argument and held that West Virginia's direct appellate procedures satisfy due process. 975 F.2d at 115-17. Despite Hutchinson's protestations that due process requires something more and that the undersigned should effectively ignore the Fourth Circuit's decision in *Billotti* based on the notion that due process has evolved since 1992, the Court is bound to follow Fourth Circuit precedent on the issue until the Fourth Circuit holds otherwise. As such, Hutchinson's claim fails.

Having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that Hutchinson has failed to establish that the state court's conclusion that he was not denied due process when the WVSCA refused to hear his petition on direct appeal was an objectively unreasonable application of, or contrary to, clearly established federal law. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on ground ten of the petition.

### K. DNA Test Results Presented During Trial

Hutchinson argues that his right to a fair and impartial jury trial was violated when the prosecution presented "flawed, skewed, and inaccurate" DNA test results at his trial. (ECF No. 3 at 62). In support of his position, Hutchinson claims that the DNA retesting performed by Human Identification Technologies in 2009 revealed that the population frequency profiles obtained by the West Virginia Biochemistry Laboratory were incorrect. (*Id.* at 62-63). Hutchinson also claims that Mr. Miller lied about the

quantity of the biological evidence that he preserved for future testing as representatives from Human Identification Technologies stated to Mr. Jarrell that any difference in test results was likely due to the amount of material left for retesting. (ECF No. 10-5 at 195). Finally, Hutchinson questions the chain of custody for the items that were retested between the time that the evidence was introduced at trial and the time that the evidence was rested. (ECF No. 3 at 61).

The state circuit court denied Hutchinson's claim and found that "the retesting of the blood evidence in this case result[ed] in the evidence having the same value that it had at trial." (ECF No. 10-1 at 273). The court recognized that any differences in the test results between 2001 and 2009 was "largely attributed" to the West Virginia Biochemistry Laboratory having larger and "fresh" samples. (*Id.* at 272). As for the chain of custody issue, the court stated that Mr. Johnson testified that the items tested for DNA evidence were in his care, custody, and control from September 2001 until March 2009, and that no other person possessed a key to the evidence room where the items were stored. (*Id.* at 273).

Addressing Hutchinson's arguments in reverse order, his chain of custody claim is unconvincing. First, Hutchinson has not clarified how this claim presents an issue cognizable in federal habeas corpus. Second, Mr. Johnson's uncontroverted testimony at Hutchinson's state habeas hearing eviscerates his claim. Mr. Johnson explained that the evidence could not be originally found as it was placed in a box apart from another box of evidence in Hutchinson's case, but the evidence was eventually found in the evidence room connected to his office. Mr. Johnson also testified that he was the only person that had access to the evidence room as he was the only person who possessed a key to that room. Given Mr. Johnson's testimony, the state circuit court was correct to deny relief

on Hutchinson's chain of custody argument.

Hutchinson also claims that Mr. Miller's testimony at trial regarding the DNA evidence was false, which violated his right to due process. As stated above, in order for Hutchinson's claim to succeed, the Court must be convinced that representatives of the state knowingly used false testimony to obtain a conviction or used testimony that they should have known was false to obtain a conviction. *Vinson*, 436 F.3d at 420 n.3 (4th Cir. 2006) (citing *Napue*, 360 U.S. at 269). As a prerequisite to relief, before reaching the "knowing" aspect of the claim, the testimony must actually be false. *Flippo v. McBride*, 393 F. App'x 93, 97 (4th Cir. 2010). Hutchinson has failed to establish that Mr. Miller's testimony related to the DNA test results was false at the time that he testified to those results. While the DNA test results differ between 2001 and 2009, particularly in population frequency, that fact alone does not mean that Mr. Miller's testimony was false in 2001. As Mr. Jarrell proffered at the state habeas hearing, a representative from Human Identification Technologies informed him that the differences in the test results were caused by a difference in the amount of material tested. The prosecution also proffered that Mr. Miller recognized that there were differences in population frequency between the testing, but attributed the variations to the degradation of the evidence. Given Hutchinson's failure to cite to any evidence contradicting Mr. Jarrell's and the prosecution's proffers related to the retesting, he cannot establish that Mr. Miller's testimony at trial regarding the DNA evidence was false.

Furthermore, "[a] new trial is [only] required if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Elmore v. Ozmint*, 661 F.3d 783, 830 (4th Cir. 2011) (quoting *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)) (markings omitted) (ellipsis in original). In this case,

given the eyewitness testimony by Ms. Rigney's children and the other physical evidence presented at trial, including photographs depicting Hutchinson with blood on his hands, chest, and face shortly after the crimes and the actual clothing that Hutchinson wore on February 9 containing a blood stain on it, the undersigned is not convinced that any false testimony related to DNA evidence by Mr. Miller would have "in any reasonable likelihood have affected the judgment of the jury." *Id.*

Finally, Hutchinson has failed to establish that Mr. Miller presented false testimony related to the preservation of biological evidence as required by West Virginia Biochemistry Laboratory policy. There is no reason to believe that Mr. Miller did not follow laboratory policy. Furthermore, any false testimony regarding Mr. Miller's preservation of evidence for future testing would not "in any reasonable likelihood have affected the judgment of the jury." *Elmore*, 661 F.3d at 830 (quoting *Giglio*, 405 U.S. at 154) (markings omitted).

Having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that Hutchinson has failed to establish that the state court's denial of his claim related to Mr. Miller's testimony and the DNA evidence was an objectively unreasonable application of, or contrary to, clearly established federal law. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on ground eleven of the petition.

### L. Burden Shifting During the Sentencing Phase

In his final claim for relief, Hutchinson contends that West Virginia's first-degree murder statute, West Virginia Code § 62-3-15, which requires a sentence of life imprisonment without parole unless a jury recommends mercy, impermissibly shifts the burden of proof to the defendant to prove that he deserves mercy. (ECF No. 3 at 67).

Because the statute does not require the prosecution to prove any aggravating factors in order for the jury to decline recommending mercy, Hutchinson alleges that the defendant is required to present a case for mitigation.[13] (*Id.* at 66). In support of his position, Hutchinson cites a number of cases related to effective assistance of counsel at the sentencing phase of capital trials. He insists that these cases require defense counsel to present mitigation evidence at sentencing proceedings in order to render constitutionally effective assistance of counsel, which, when applied to West Virginia's first-degree murder statute, shifts the burden of proving the propriety of mercy to the defendant. Hutchinson also relies on *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). In *Francis*, the Supreme Court held that a defendant's due process rights were violated where the jury was instructed that it could presume that the defendant intended the ordinary consequences of his voluntary acts, but that the presumption may be rebutted by the defendant. 471 U.S. at 309, 326. The Court reasoned that the jury instruction "created an unconstitutional burden-shifting presumption with respect to the element of intent." *Id.* at 318.

Despite Hutchinson's assertion that West Virginia Code § 62-3-15 places a burden upon a defendant to present mitigating evidence, the WVSCA has held the

---

[13] It appears that Hutchinson mistakenly cites West Virginia Code § 61-8D-2(a) and West Virginia Code § 61-2-2 in support of his argument. The latter is only relevant in that it establishes the penalty for first degree murder; however, section 62-3-15 concerns the jury's ability to recommend mercy. West Virginia Code § 62-3-15 states in pertinent part:

> If a person indicted for murder be found by the jury guilty thereof, they shall in their verdict find whether he or she is guilty of murder of the first degree or second degree. If the person indicted for murder is found by the jury guilty thereof, and if the jury find in their verdict that he or she is guilty of murder of the first degree . . . he or she shall be punished by imprisonment in the penitentiary for life, and he or she, notwithstanding the provisions of article twelve, chapter sixty-two of this code, shall not be eligible for parole: Provided, That the jury may, in their discretion, recommend mercy, and if such recommendation is added to their verdict, such person shall be eligible for parole in accordance with the provisions of said article twelve, except that, notwithstanding any other provision of this code to the contrary, such person shall not be eligible for parole until he or she has served fifteen years.

opposite. As the state circuit court pointed out in its rejection of Hutchinson's claim, the WVSCA has concluded that "provisions of West Virginia Code § 62-3-15 do not place a burden of proof on either the State or the defendant for the mercy phase of a first degree murder trial where that phase is bifurcated." *State v. McLaughlin*, 700 S.E.2d 289, 234 (W. Va. 2010); *see also* (ECF No. 10-1 at 290). Upon review of the statute, the WVSCA's interpretation appears reasonable. In addition, although a seemingly clever argument at first blush, defense counsel being constitutionally required to render effective assistance at sentencing no more shifts the burden of proof at the sentencing phase to the defendant than the requirement that counsel render effective assistance at trial shifts the burden of proving the elements of the offense to the defendant. In other words, a defendant is not assigned any burden of disproving the elements of an offense merely because counsel must provide effective assistance at trial, and the same goes for sentencing proceedings. Moreover, the effective assistance of counsel cases cited by Hutchinson concern capital sentencing proceedings and statutes that essentially required a defendant to present mitigating evidence once a statutory aggravating factor was proven by the prosecution. *See Rompilla v. Beard*, 545 U.S. 374, 378, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (citing 42 Pa. Cons. Stat. § 9711 (2002)); *Wiggins v. Smith*, 539 U.S. 510, 515, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citing Md. Ann. Code, Art. 27, § 413 (1996)). That is not the case here; as pointed out above, the WVSCA has held that West Virginia Code § 62-3-15 places no burden upon the defendant. *McLaughlin*, 700 S.E.2d at 234. While life without parole may be the default sentence for first-degree murder in West Virginia, a defendant is not required by statute to meet any burden of proof for the jury to recommend mercy. Certainly, a life without parole sentence as a default sentence for a crime is not unconstitutional in and of itself for an

70

adult offender, even for crimes less heinous than first-degree murder. *See Harmelin v. Michigan*, 501 U.S. 957, 994-96, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (holding life without parole sentence for possession of large amount of cocaine without consideration of any mitigating factors, such as defendant's lack of prior criminal record, was not unconstitutional).

Lastly, Hutchinson's citation to *Francis* is inapposite as that case concerned shifting the burden of proof on an *element of the offense*, which Hutchinson does not argue here. 471 U.S. at 318. Assuming that the West Virginia statute does place some burden on a criminal defendant to come forward with mitigating evidence at the sentencing hearing, Hutchinson has not cited any clearly established federal law in noncapital cases that would forbid such a practice. *Cf. Patterson v. New York*, 432 U.S. 197, 205-08, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977) (holding that state may place burden on defendant to prove mitigating circumstances necessary to raise affirmative defense); *Coleman v. Risley*, 839 F.2d 434, 513 n.43 (9th Cir. 1988) (Reinhardt, J., dissenting) ("If the state may impose on a defendant the burden of persuasion on mitigating circumstances presented as affirmative defenses, it certainly may, in a noncapital case, impose the same burden on the existence of mitigating factors during the sentencing proceeding."). In light of the Supreme Court's holding in *Patterson*, it is unlikely that Hutchinson's claim regarding burden shifting, even if an accurate interpretation of the statute, would violate clearly established federal law. Indeed, Hutchinson cites no clearly established federal law in support of his position. At any rate, because Hutchinson has failed to establish the factual accuracy of his challenge to the statute—in other words that burden shifting occurs in the first place—his claim cannot succeed.

Having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that Hutchinson has failed to establish that the state court's denial of his unconstitutional burden shifting claim was an unreasonable application of, or contrary to, clearly established federal law. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on ground twelve of the petition.

## V.  <u>Proposal and Recommendations</u>

The undersigned respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** as follows**:**

1. Respondent's Corrected Motion for Summary Judgment (ECF No. 21) be **GRANTED,** and Respondent's Motion for Summary Judgment (ECF No. 10) be **DENIED** as moot;

2. Petitioner's Petition for a Writ of Habeas Corpus by a Person in State Custody (ECF No. 2) be **DENIED**; and

3. That this action be **DISMISSED, with prejudice**, and removed from the docket of the court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, Petitioner shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Chambers and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to Petitioner, Respondent, and any counsel of record.

**FILED:** January 9, 2015

Cheryl A. Eifert
United States Magistrate Judge